[Cite as *State v. Poutney*, 2016-Ohio-4866.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No.   103686

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MARK H. POUNTNEY

DEFENDANT-APPELLANT

### JUDGMENT:
REVERSED AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-595264-A

**BEFORE:**   Boyle, P.J., Blackmon, J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:**   July 7, 2016

**ATTORNEY FOR APPELLANT**

Michael P. Maloney
24441 Detroit Road
Suite 200
Westlake, Ohio   44145


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Jeffrey Michael Heller
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, P.J.:

{¶1} Defendant-appellant, Mark Pountney, appeals his conviction. He raises one assignment of error for our review:

> The state presented insufficient evidence to prove that appellant possessed more than five times the bulk amount of the controlled substance fentanyl.

{¶2} Finding merit to his appeal, we reverse the trial court's judgment and remand.

## I. Procedural History and Factual Background

{¶3} In May 2015, Pountney was indicted on five counts: two counts of theft in violation of R.C. 2913.02(A)(1), one count of identity fraud in violation of R.C. 2913.49(B)(1), with a furthermore clause that the victim was elderly or disabled, and two counts of drug possession in violation of R.C. 2925.11(A) (possessing between 5 and 50 times the bulk amount of fentanyl and possessing less than the bulk amount of acetaminophen with codeine). Pountney waived his right to a jury trial, and the case proceeded to the bench.

{¶4} Prior to trial, Pountney stipulated to the allegations in Counts 1, 2, 3, and 5 (the theft counts, identity fraud, and drug possession involving acetaminophen with codeine). Pountney also stipulated to part of Count 4. Specifically, regarding Count 4, Pountney stipulated that he knowingly obtained fentanyl, a schedule II drug, and that the amount obtained was ten three-day patches at 50 micrograms per hour of fentanyl per patch. But he disputed that the patches amounted to a "bulk amount" of fentanyl or "some multiple of the bulk amount." The case proceeded to a bench trial on the state's

proof regarding the "bulk amount" of fentanyl.

{¶5} At the close of the state's case, the trial court found Pountney guilty of possessing five times the bulk amount of fentanyl as charged in Count 4. The trial court also found Pountney guilty of theft and aggravated theft as charged in Counts 1 and 2; guilty of identity fraud as charged in Count 3; and guilty of drug possession as charged in Count 5, because Pountney had stipulated to the charges prior to trial.

{¶6} At sentencing, the trial court merged several of the offenses as the parties stipulated. The trial court merged Counts 1 and 4, and Counts 2 and 5. The trial court then merged Counts 2 and 5 into Count 1, but did not merge Count 3 with any other offense. The state elected to proceed on Count 4, possession of five times the bulk amount of fentanyl.

{¶7} The trial court sentenced Pountney to three years in prison on Count 4, and 18 months on Count 3, to be served concurrent to each other. The trial court imposed a fine of $7,500 and notified Pountney that he would be subject to three years of mandatory postrelease control upon his release from prison. It is from this judgment that Pountney appeals.

## II.  Sufficiency of the Evidence

{¶8} Pountney stipulated to possessing ten patches of fentanyl containing 50 micrograms of fentanyl per hour. The trial court found that Pountney possessed between 5 and 50 times the "bulk amount" of fentanyl, which makes the offense a second-degree felony. R.C. 2925.11(C)(1)(c). In his sole assignment of error, Pountney argues the

state failed to present sufficient evidence that he possessed the requisite "bulk amount" of fentanyl.

{¶9} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), citing *Black's Law Dictionary* 1433 (6th Ed.1990). When an appellate court reviews a record upon a sufficiency challenge, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶10} R.C. 2925.11(A) provides that "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." Fentanyl is a schedule II controlled substance. R.C. 3719.41 SCHEDULE II (B)(9).

{¶11} Under R.C. 2925.11(C)(1)

If the drug involved in the violation is a compound, mixture, preparation, or substance included in schedule I or II, with the exception of marihuana, cocaine, L.S.D., heroin, hashish, and controlled substance analogs, whoever violates division (A) of this section is guilty of aggravated possession of drugs. The penalty for the offense shall be determined as follows:

(a) Except as otherwise provided in division (C)(1)(b), (c), (d), or (e) of this section, aggravated possession of drugs is a felony of the fifth degree, and division (B) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term on the offender.

* * *

(c)   If the amount of the drug involved equals or exceeds five times the bulk amount but is less than fifty times the bulk amount, aggravated possession of drugs is a felony of the second degree, and the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the second degree.

{¶12} Pountney challenges the state's evidence regarding "bulk amount," not that he possessed between "five and fifty times" of the "bulk amount" (essentially because if the state established the "bulk amount," then it established "five times the bulk amount"). Thus, the crux of this appeal is whether the state established the "bulk amount."

{¶13} R.C. 2925.01(D)(1)(d) defines the "bulk amount" for a schedule II drug as "[a]n amount equal to or exceeding twenty grams or five times the maximum daily dose in the usual dose range specified in a standard pharmaceutical reference manual of a compound, mixture, preparation, or substance that is or contains any amount of a schedule II opiate or opium derivative."   Here, the state sought to prove the bulk amount solely under "maximum daily dose in the usual dose range."

{¶14} In *State v. Montgomery*, 17 Ohio App.3d 258, 479 N.E.2d 904 (1st Dist.1984), the court explained that, as a question of fact, "maximum daily dose" must be proved "(1) by stipulation, (2) by expert testimony as to what a standard pharmaceutical reference manual prescribes, or (3) by a properly proven copy of the manual itself."   *Id*. at 260.

{¶15} The state presented an expert, Paul Schad, to establish the "maximum daily dose in the usual dose range" of fentanyl.   Schad was a compliance specialist for the Ohio State Board of Pharmacy.   Schad wrote an expert report prior to trial, in which he

opined that the "bulk amount" of the fentanyl patches in this case, 50 micrograms per hour patches, was two patches.   In making this determination, Schad stated that he used a standard pharmaceutical reference manual called the American Hospital Formulary Service.   He explained that this manual is "a standard pharmaceutical reference used by pharmacists."

{¶16} R.C. 2925.01(M) defines "standard pharmaceutical reference manual" as "the current edition, with cumulative changes if any, of references that are approved by the state board of pharmacy."   The American Hospital Formulary Service Drug Information ("AHFS") is a standard pharmaceutical reference approved by the State Board of Pharmacy.   *See* O.A.C. 4729-11-07.

{¶17} Schad testified that the "usual dose range" for a specific drug is determined by referring to a standard pharmaceutical reference.   According to Schad, doctors only prescribe fentanyl patches to patients who are already taking an opiate or are already "opiate tolerant."   Because of this, the AHFS manual does not contain a "usual dose range" for fentanyl patches.   Schad explained that this is because "the dosing of fentanyl patches is based on whatever the dose is of the opiate that the patient is currently taking."

{¶18} Schad attached to his report what he referred to as a "fentanyl monograph," which was from the 2015 AHFS manual.   The fentanyl monograph includes a table that Schad explained contains "conversions from the different opiates to the dosing" of a fentanyl patch.   The table is as follows:

**Table 2: Transdermal Fentanyl Dose Based on
Current Oral Opiate Dosage**

| Daily Dosage of Oral Opiate (in mg/day) | Transdermal Fentanyl (in mcg/hr) |
|---|---|
| **Morphine sulfate** | |
| 60 - 134 | 25 |
| 135 - 224 | 50 |
| 225 - 314 | 75 |
| 315 - 404 | 100 |
| | |
| **Oxycodone hydrochloride** | |
| 30 - 67 | 25 |
| 67.5 - 112 | 50 |
| 112.5 - 157 | 75 |
| 157.5 - 202 | 100 |
| | |
| **Codeine phosphate** | |
| 150 - 447 | 25 |
| 448 - 747 | 50 |
| 748 - 1047 | 75 |
| 1048 - 1347 | 100 |
| | |
| **Hydromorphone hydrochloride** | |
| 8 - 17 | 25 |
| 17.1 - 28 | 50 |
| 28.1 - 39 | 75 |
| 39.1 - 51 | 100 |

{¶19} Schad testified that although the AHFS manual does not have a "usual dose range" for fentanyl, it does for morphine. Schad testified that because fentanyl is a "prototype" or "derivative" of morphine, he used the "usual dose range" of morphine as stated in the AHFS manual to obtain the "usual dose range" for fentanyl. Schad said the "usual dose range" for morphine is 10 to 30 milligrams every four hours. Thus, Schad explained that the "maximum daily dose" for morphine is the "usual dose range" (30 milligrams every four hours) multiplied by six times per day, which equals 180

milligrams of morphine in a 24-hour period.

{¶20} Referring to Table 2 in the fentanyl monograph, Schad pointed to the daily dose of oral morphine sulfate that included the "maximum daily dose in the usual dose range," which would fall under the second line, 135 to 224 milligrams of morphine per day. Schad stated that using Table 2, the conversion of 180 milligrams of oral morphine to the fentanyl patch would be the 50 micrograms per hour patch. Schad then calculated the "maximum daily dose" of the fentanyl patch by multiplying 50 micrograms by 24 hours, which he concluded equals 1,200 micrograms in a 24-hour period.

{¶21} Schad explained that "five times the maximum daily dose" would be the "maximum daily dose" (1,200 micrograms) multiplied by five, which equals 6,000 micrograms per day. Schad testified that according to the AHFS manual, each 50 micrograms per hour fentanyl patch contains five milligrams (or 5,000 micrograms) of fentanyl in the "drug reservoir," which is released to the patient over a period of three days. Thus, Schad stated that if "you do the math down to a fraction," then "five times the maximum daily dose" would be reached with 1.2 patches. But because you cannot divide the patches, it would take two patches to equal "five times the maximum daily dose."

{¶22} Schad further explained that the 2013 controlled substance reference table attached to his report was published by his organization to provide "bulk amounts" of fentanyl patches to law enforcement officials and the legal community. The controlled substance table states that two patches of a 50 micrograms per hour patch equals the

"bulk amount" of fentanyl.

{¶23} Schad stated that his opinions were based on a reasonable degree of scientific certainty, and that to make his findings, he referred to the AHFS manual.

{¶24} On cross-examination, Schad agreed that if a patient is taking 135 to 180 milligrams per day of an oral opiate, then a doctor will prescribe a 50 micrograms per hour fentanyl patch as an "initial dose" to the patient. Schad agreed that according to the fentanyl monograph in the AHFS manual, the manufacturers of fentanyl patches consider "the initial dosages of transdermal fentanyl to be conservative estimates." Schad further agreed that patients who are prescribed an "initial dose" of transdermal fentanyl (i.e., wearing a fentanyl patch) can often handle a more potent patch, or even wear multiple patches, up to 300 micrograms per hour. But Schad explained that the true "maximum daily dose" is not the same as the "maximum daily dose in the usual dose range" to determine the "bulk amount" of a drug.

{¶25} Schad also admitted on cross-examination that the controlled substance reference table that is attached to his report is not a standard pharmaceutical reference manual.

{¶26} After reviewing Schad's testimony, we agree with Pountney that the state failed to establish that he possessed a "bulk amount" of fentanyl. "Bulk amount" is "the maximum daily dose in the usual dose range *specified in a standard pharmaceutical reference manual*." (Emphasis added.) R.C. 2925.01(D)(1)(d). Schad testified that there is no "maximum daily dose in the usual dose range" for fentanyl patches in the

standard pharmaceutical reference manual. R.C. 2925.01(D)(1)(d) explicitly states that the "maximum daily dose in the usual dose range" is taken directly from what a "standard pharmaceutical reference manual" specifies it is. Schad used the AHFS manual, which is a "standard pharmaceutical reference" manual, to arrive at his opinion. But Schad stated that he used the "usual dose range" for morphine to determine the "usual dose range" for the fentanyl patches. But R.C. 2925.01(D)(1)(d) does not state that the "usual dose range" can be determined by using the "usual dose range" of a another drug, even if the drug at issue is a "prototype" or "derivative" of the other drug that does have a "usual dose range" specified in the standard pharmaceutical reference manual.

{¶27} The state argues that this case is analogous to *State v. Bange*, 4th Dist. Ross No. 10CA3160, 2011-Ohio-378, where the court held that the state proved the defendant possessed a bulk amount of oxycodone. But notably in *Bange*, the expert testified that the "usual dose range" of oxycodone *was specified* in the standard pharmaceutical reference manual. Here, Schad testified that he used the "usual dose range" of morphine as specified in the standard pharmaceutical reference manual, not fentanyl's "usual dose range" as specified in the standard pharmaceutical reference manual.

{¶28} The state also argues that this case is distinguishable from *State v. Huber*, 187 Ohio App.3d 697, 2010-Ohio-2919, 933 N.E.2d 345 (2d Dist.), where the court found that the state did not prove that the defendant possessed a "bulk amount" of fentanyl because (1) there were no relevant stipulations, (2) a standard pharmaceutical manual was not introduced, and (3) no expert testified to what a standard pharmaceutical

reference manual prescribes. The state contends that an expert did testify in this case as to what the "bulk amount" of the fentanyl patches was. Although an expert testified in this case, he did not testify as to what the standard pharmaceutical reference manual prescribed for the drug at issue.

{¶29} Accordingly, we sustain Pountney's sole assignment of error because we agree that the state failed to prove beyond a reasonable doubt that he possessed the requisite bulk amount of fentanyl. Thus, Pountney should have been convicted of a fifth-degree felony drug possession, rather than a second-degree felony drug possession. R.C. 2925.11(C)(1)(a).

{¶30} Judgment reversed and the case is remanded with instructions for the trial court to enter a finding of guilt for Count 4 as a fifth-degree felony drug possession, and to resentence him accordingly.

It is ordered that appellant recover from appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

PATRICIA ANN BLACKMON, J., and

ANITA LASTER MAYS, J., CONCUR