[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Pountney,* Slip Opinion No. 2018-Ohio-22.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-22

THE STATE OF OHIO, APPELLANT, *v.* POUNTNEY, APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Pountney,* Slip Opinion No. 2018-Ohio-22.]

*Criminal law—R.C. 2925.11(C)(1)(c)—Aggravated possession of drugs—Fentanyl—Enhanced felony levels—R.C. 2925.01(D)(1)(d)—Definition of "bulk amount"—Because state failed to prove maximum daily dose in the usual dose range specified in a standard pharmaceutical reference manual for transdermal fentanyl, it failed to establish the "bulk amount" of that drug for purposes of increasing felony level—State may not rely on usual dose range of morphine to establish bulk amount of transdermal fentanyl—Judgment of the court of appeals affirmed.*

(No. 2016-1255—Submitted September 13, 2017—Decided January 4, 2018.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 103686, 2016-Ohio-4866.

_____

**FRENCH, J.**

{¶ 1} In this appeal, we examine the statutory requirements for proving enhanced felony levels of aggravated possession of fentanyl based on the amount of the drug involved. Ohio defines these levels in terms of multiples of the "bulk amount," which for the fentanyl at issue in this case means "five times the maximum daily dose in the usual dose range specified in a standard pharmaceutical reference manual." R.C. 2925.01(D)(1)(d). Appellant, the state of Ohio, asks this court to hold that "because there is no 'usual dose range' of fentanyl, the State may rely upon the usual dose range of morphine, the prototype drug for fentanyl, to establish the bulk amount of fentanyl under R.C. 2925.01(D)(1)(d)."

{¶ 2} Fentanyl, a Schedule II controlled substance, is a synthetic opioid that is approximately 100 times more potent than morphine and 50 times more potent than heroin. R.C. 3719.41 (Schedule II(B)(9)); United States Dept. of Justice, Drug Enforcement Administration, *Drugs of Abuse, A DEA Resource Guide* 40 (2017), https://www.dea.gov/pr/multimedia-library/publications/drug_of_abuse.pdf#page =40 (accessed Dec. 12, 2017). Fentanyl and related drugs were involved in nearly 60 percent of Ohio's 4,050 overdose deaths in 2016. Ohio Dept. of Health, News Release, *Fentanyl, Carfentanil and Cocaine Drive Increase in Drug Overdose Deaths in 2016* (Aug. 30, 2017), http://www.odh.ohio.gov/-/media/ODH/ASSETS/Files/health/injury-prevention/ODH-News-Release----2016-Ohio-Drug-Overdose-Report.pdf?la=en (accessed Dec. 12, 2017). And in the first two months of 2017, approximately 90 percent of unintentional overdose deaths in 25 Ohio counties involved fentanyl, fentanyl analogs or both. Daniulaityte, Juhascik, Strayer, Sizemore, Harshbarger, Antonides, and Carlson, *Overdose Deaths Related to Fentanyl and its Analogs—Ohio, January-February 2017*, 66 Morbidity & Mortality Weekly Report No. 34, 904, 905-906, https://www.cdc.gov/mmwr/volumes/66/wr/pdfs/mm6634a3.pdf (accessed Dec. 12, 2017), datum corrected in *Errata*: *Vol. 66 No. 34*, 66 Morbidity & Mortality

Weekly Report No. 38, 1030, https://www.cdc.gov/mmwr/volumes/66/wr/pdfs/mm6638a8.pdf (accessed Dec. 12, 2017) (clarifying that the number of counties was 25).

{¶ 3} To be sure, enhanced felony prosecution for possession of fentanyl is one weapon in the state's arsenal in the war on drug-related crime. But what the state asks here requires the General Assembly, not this court, to act. We reject the state's interpretation of the enhancement provisions for fentanyl possession because it conflicts with unambiguous statutory language. We affirm the judgment of the court of appeals.

### Facts and procedural background

{¶ 4} Appellee, Mark H. Pountney, was indicted on two counts of theft, one count of identity fraud, and two counts of drug possession—one of which involved fentanyl and one of which involved acetaminophen with codeine. Pountney stipulated to the allegations underlying the charges of theft, identity fraud, and possession of acetaminophen with codeine. Count 4 of the indictment—the only count relevant here—alleged that Pountney knowingly obtained, possessed or used at least 5 but not more than 50 times the bulk amount of fentanyl, in violation of R.C. 2925.11(A), which is a second-degree felony under R.C. 2925.11(C)(1)(c).

{¶ 5} Subject to certain exceptions not applicable here, R.C. 2925.11(A) prohibits a person from knowingly obtaining, possessing or using a controlled substance or controlled-substance analog. A violation of R.C. 2925.11(A) involving fentanyl constitutes aggravated possession of drugs. R.C. 2925.11(C)(1); R.C. 3719.41 (Schedule II(B)(9)).

{¶ 6} Except as provided in R.C. 2925.11(C)(1)(b) through (e), aggravated possession of drugs is a fifth-degree felony. R.C. 2925.11(C)(1)(a). If, however, the amount of the drug involved meets statutorily defined thresholds, the offense is enhanced to a first-degree, second-degree or third-degree felony. R.C. 2925.11(C)(1)(b) through (e). As relevant here, "If the amount of the drug involved

equals or exceeds five times the bulk amount but is less than fifty times the bulk amount," the offense is a second-degree felony. R.C. 2925.11(C)(1)(c).

{¶ 7} The General Assembly has defined the "bulk amount" of a Schedule II opiate or opium derivative, like fentanyl, as an "amount equal to or exceeding twenty grams or five times the maximum daily dose in the usual dose range specified in a standard pharmaceutical reference manual." R.C. 2925.01(D)(1)(d). Here, we are concerned only with the second prong of that definition. Pountney stipulated that he knowingly obtained ten three-day transdermal fentanyl patches, each of which delivered 50 micrograms of fentanyl per hour. He disputed, however, that the patches equaled the "bulk amount or some multiple of the bulk amount" of transdermal fentanyl.

{¶ 8} The Cuyahoga County Court of Common Pleas conducted a bench trial solely on the state's proof regarding the "bulk amount" of transdermal fentanyl. If the state proved that the ten fentanyl patches equaled or exceeded five times the bulk amount of transdermal fentanyl, Pountney would be guilty of a second-degree felony; otherwise, based on his stipulations, he would be guilty of a fifth-degree felony. R.C. 2925.11(C)(1)(a) and (e).

{¶ 9} The trial court found Pountney guilty on all counts in the indictment, including second-degree-felony aggravated possession of fentanyl involving at least five times the bulk amount. After merging allied offenses, the trial court sentenced Pountney to three years in prison for aggravated possession of fentanyl and 18 months in prison for identity fraud, to be served concurrently. The trial court also imposed a $7,500 fine and three years of mandatory postrelease control.

{¶ 10} Pountney appealed his conviction for aggravated possession of fentanyl, arguing that the state failed to present sufficient evidence of the "bulk amount." The Eighth District Court of Appeals agreed with Pountney, reversed the trial court's judgment, and remanded this case with instructions for the trial court

4

to enter a finding of guilty on Count 4 as a fifth-degree felony and to resentence Pountney accordingly.

{¶ 11} This court accepted the state's discretionary appeal. The state's single proposition of law asserts that the state may rely upon the usual dose range of morphine, the prototype opiate, to establish the bulk amount of fentanyl under R.C. 2925.01(D)(1)(d). We reject the state's proposition.

### The evidence

{¶ 12} At trial, the state presented an expert report and testimony from Paul Schad, a pharmacist employed as a compliance specialist for the Ohio State Board of Pharmacy. Attached to Schad's report is a portion of the *American Hospital Formulary Service Drug Information* ("AHFS"), which the board of pharmacy has approved as a standard pharmaceutical reference manual, Ohio Adm.Code 4729-11-07(F).

{¶ 13} Schad's report cites the R.C. 2925.01(D)(1)(d) definition of "bulk amount"—"[a]n amount equal to or exceeding * * * five times the maximum daily dose in the usual dose range specified in a standard pharmaceutical reference manual." In his testimony, Schad stated, "I would refer to the standard pharmaceutical reference" to determine the usual dose range for a particular drug. Schad's report states, "Pursuant to the definition of Bulk Amount, the 'maximum daily dose in the usual dose range specified in a standard pharmaceutical reference manual' was taken from" the AHFS. But Schad admitted, "you're not going to see a usual dosage range" for fentanyl patches in the AHFS. Nevertheless, he stated that the bulk amount of 50-microgram-per-hour fentanyl patches is two patches.

{¶ 14} The AHFS states that transdermal fentanyl should be used only with patients who are opiate tolerant:

Dosage of transdermal fentanyl should be individualized according to the clinical status of the patient, desired therapeutic effect, and

patient age and weight and should be assessed at periodic intervals. However, the most important factor to be considered in determining the appropriate dose is the degree of existing opiate tolerance. In selecting an appropriate initial dose of the transdermal system, consideration also must be given to the daily dose, potency, and characteristics * * * of the opiate the patient has been receiving and the reliability of potency estimates, which may vary by route, used to calculate an equivalent transdermal dose.

(Endnotes omitted.)

{¶ 15} Having acknowledged that the AHFS does not state a "usual dose range" for transdermal fentanyl, Schad explained, "We need to look at dosing—usual dosage range of the other opiates, considering Morphine as the prototype of opiates. We look at the usual dosage range of Morphine, finding a maximum daily dose within the usual dosage range of Morphine, and convert that to Fentanyl patches." Schad then engaged in a series of calculations in an effort to deduce the bulk amount of transdermal fentanyl from the usual dose range of morphine.

{¶ 16} Schad testified that the "usual dosage range of oral morphine found in the standard pharmaceutical reference is 10 to 30 milligrams every four hours," for a maximum daily dose in the usual dose range of 180 milligrams. Schad then turned to Table 2 of the AHFS manual regarding fentanyl. Table 2, titled Transdermal Fentanyl Dose Based on Current Oral Opiate Dosage, sets out manufacturer-provided, conservative, initial dosage recommendations for switching an opiate-tolerant patient to transdermal fentanyl from other, oral opiates, including morphine. For a patient who is being transferred from morphine, the table recommends a transdermal fentanyl dose of 25, 50, 75 or 100 micrograms per hour, based upon the patient's daily dose of morphine (ranging in the table from 60 to 404 milligrams). For a patient who has been receiving the 180-milligram

maximum daily dose in the usual dose range for morphine, Table 2 recommends an initial transdermal fentanyl dose of 50 micrograms per hour. Based solely on that conversion, Schad testified that 1200 micrograms per day—50 micrograms per hour multiplied by 24 hours—is the maximum daily dose in the usual dose range for transdermal fentanyl.

**{¶ 17}** Schad next multiplied 1200 micrograms by five to calculate a "bulk amount" of 6000 micrograms, or 6 milligrams, for transdermal fentanyl. Because an indivisible 50-microgram-per-hour fentanyl patch contains 5 milligrams of fentanyl, Schad testified that it takes two patches to equal the "bulk amount."

*Analysis*

**{¶ 18}** The Eighth District held that the state did not present sufficient evidence that Pountney possessed the "bulk amount" of fentanyl. 2016-Ohio-4866, ¶ 26.

**{¶ 19}** When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed but, rather, whether the evidence, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. Although the Eighth District framed its decision in terms of sufficiency of the evidence, the overriding question in this case is the meaning of R.C. 2925.01(D)(1)(d)'s definition of "bulk amount" and its application to the undisputed facts.

**{¶ 20}** Interpretation of a statute is a question of law that we review de novo. *State v. Pariag*, 137 Ohio St.3d 81, 2013-Ohio-4010, 998 N.E.2d 401, ¶ 9. "The primary goal of statutory construction is to ascertain and give effect to the legislature's intent," as expressed in the plain meaning of the statutory language.

*State v. Lowe*, 112 Ohio St.3d 507, 2007-Ohio-606, 861 N.E.2d 512, ¶ 9. If the statutory language is unambiguous, we apply it as written. *Pariag* at ¶ 10. Only when a statute is ambiguous may we engage in further construction. *Id.*

{¶ 21} The method of proving an increased felony level for drug possession based on the amount of the drug involved depends on the identity of the drug. For Schedule II controlled substances like fentanyl, the increase is based on either the weight of the drug or multiples of the "bulk amount" of the drug. *See* R.C. 2925.11(C)(1). For other drugs, the increase is based solely on the weight of the drug, *see* R.C. 2925.11(C)(3) and (4), or on either the weight of the drug or the number of "unit doses," *see* R.C. 2925.11(C)(5). Here, to convict Pountney of second-degree felony aggravated possession of drugs, the state had to prove that Pountney obtained or possessed at least five times the bulk amount of transdermal fentanyl. R.C. 2925.11(C)(1)(c).

{¶ 22} The starting point for establishing the bulk amount of a controlled substance under the second prong of R.C. 2925.01(D)(1)(d) is the "maximum daily dose in the usual dose range specified in a standard pharmaceutical reference manual." By using that language, the General Assembly chose to tie the definition of "bulk amount" to the contents of a reference manual beyond its control. The plain language of R.C. 2925.01(D)(1)(d) requires that the maximum daily dose in the usual dose range be *specified* in a standard pharmaceutical reference manual. "Specify" means "to mention or name in a specific or explicit manner: tell or state precisely or in detail." *Webster's Third New International Dictionary* 2187 (2002).

{¶ 23} The state may prove the maximum daily dose in the usual dose range in one of three ways: "(1) by stipulation, (2) by expert testimony as to what a standard pharmaceutical reference manual prescribes, or (3) by a properly proven copy of the manual itself." *State v. Montgomery*, 17 Ohio App.3d 258, 260, 479 N.E.2d 904 (1st Dist.1984); *but see State v. Caldwell*, 5th Dist. Richland No. CA-2369, 1986 WL 7456, *3 (June 23, 1986) (approving judicial notice of bulk amount

stated in a standard pharmaceutical reference manual). The state contends that it established the bulk amount of transdermal fentanyl through Schad's expert report and testimony and the portion of the AHFS regarding fentanyl that was admitted as evidence.

{¶ 24} The AHFS explicitly states usual dose ranges for certain controlled substances, including morphine. Schad repeatedly stated that the AHFS specifies a usual dose range of 10 to 30 milligrams every four hours for morphine. And Ohio courts have noted direct statements of usual dose ranges for other controlled substances in the AHFS or other standard pharmaceutical reference manuals. *See State v. Bange*, 4th Dist. Ross No. 10CA3160, 2011-Ohio-378, ¶ 12 (quoting from the AHFS entry for " 'Oxycodone Hydrochloride Tablets USP' " a "usual adult dose" of " '2 to 15 mg every 4 to 6 hours as needed' "); *State v. Baker*, 2d Dist. Montgomery No. 7753, 1982 WL 3801, *2 (Sept. 23, 1982) ("In examining any one of a number of 'standard pharmaceutical reference manuals' as defined in R.C. 2925.01(N), one finds that the maximum daily dose (in the usual dosage range specified) for Methaqualone is 300 milligrams").

{¶ 25} The AHFS does not, however, specify either a "usual dose range" or a "maximum daily dose in the usual dose range" for transdermal fentanyl. Instead, it directs that dosage of transdermal fentanyl should be individualized and periodically assessed. The state concedes that "there was no 'usual dose range' for fentanyl because doctors only ever prescribe fentanyl based on whatever dose of opiate the patient is already taking." This creates a problem of proof for the prosecution, but it is not a problem that we may remedy by ignoring the unambiguous statutory language the General Assembly has employed.

{¶ 26} Though Schad testified that he "refer[ed] to" the AHFS to make his findings, he did not identify a "maximum daily dose in the usual dose range specified in a standard pharmaceutical reference manual" for fentanyl, as R.C. 2925.01(D)(1)(d) requires. He did not identify a "usual dose range" for transdermal

fentanyl, either by reference to the AHFS or otherwise. The Ohio Attorney General, as amicus curiae, argues that R.C. 2925.01(D)(1)(d) is satisfied if the reference manual specifies "[t]he *manner for determining* fentanyl's 'usual dose range.' " (Emphasis added.) But that reading is contrary to the plain statutory language, which requires that the manual specify the maximum daily dose in the usual dose range. In context, the plain meaning of "specified in a standard pharmaceutical reference manual" requires more than a reference point for calculating a maximum daily dose; the manual must specify the usual dose range itself, or at least the maximum daily dose within that range.

{¶ 27} Even assuming that the absence of an express statement in the AHFS of the usual dose range of transdermal fentanyl does not, in itself, defeat the state's position, Schad's testimony does not establish a maximum daily dose in the usual dose range for fentanyl by reference to the AHFS. Table 2 sets out the drug manufacturer's conservative, initial dosage recommendations for switching opiate-tolerant patients from oral opiates to transdermal fentanyl, but it does not establish analgesic equivalents. In fact, the AHFS warns that Table 2 should not be used to convert patients *from* transdermal fentanyl *to* the listed oral opiates, because the conversions may result in an overestimated dose of the oral opiate.

{¶ 28} From Table 2's recommendation of an initial 50-microgram-per-hour dose of transdermal fentanyl for a patient being transitioned from the 180-milligram maximum daily dose in the usual dose range of morphine, Schad stated that 50 micrograms per hour, or 1200 micrograms per day, is the maximum daily dose in the usual dose range of transdermal fentanyl. But he acknowledged the statement in the AHFS that "many patients are likely to require upward dosage titration after initial application of a transdermal dose" and that many patients will have their doses increased beyond 50 micrograms per hour. He also acknowledged that fentanyl patches are manufactured in doses as high as 100 micrograms per hour and that doctors may prescribe multiple patches to be worn simultaneously to

increase a patient's hourly and daily doses of fentanyl. Nothing in the AHFS, including Table 2, supports Schad's testimony that the initial, conservative dose of transdermal fentanyl recommended for a patient being transitioned from the maximum daily dose in the usual dose range of morphine equals the maximum daily dose in the usual dose range of transdermal fentanyl.

{¶ 29} Schad relied upon Table 2's recommended conversion from morphine to transdermal fentanyl to calculate the maximum daily dose in the usual dose range, but applying Schad's methodology to other oral opiates listed in Table 2 results in different recommended doses of transdermal fentanyl. For example, Table 2 recommends that a patient taking the 360-milligram maximum daily dose in the usual dose range of codeine phosphate be switched to a transdermal fentanyl dose of 25 micrograms per hour but that a patient taking the 120-milligram maximum daily dose in the usual dose range of methadone hydrochloride be switched to a transdermal fentanyl dose of 100 micrograms per hour.[1] Each of those doses differs from Schad's calculation of the maximum daily dose in the usual dose range for transdermal fentanyl, based on morphine. So even using Schad's methodology, the maximum daily dose in the usual dose range of transdermal fentanyl is a moving target that provides no meaningful guidance to potential offenders or to the prosecutors who bring criminal charges.

{¶ 30} In *State v. Huber*, 187 Ohio App.3d 697, 2010-Ohio-2919, 933 N.E.2d 345 (2nd Dist.)—apparently the only other Ohio appellate decision to address the sufficiency of evidence of the bulk amount of fentanyl based on the maximum daily dose in the usual dose range—the Second District held that the state failed to prove the maximum daily dose in the usual dose range of fentanyl

---

[1] For these comparisons only, we take the maximum daily doses in the usual dose range from the board of pharmacy's Controlled Substance Reference Table (which at the relevant time was not an approved pharmaceutical reference manual), because the record does not contain the portions of the AHFS regarding the oral opiates listed in Table 2.

when there was no stipulation, the state did not submit an authenticated copy of a standard pharmaceutical reference manual that specified the maximum daily dose in the usual dose range, and there was no expert testimony "as to what a standard pharmaceutical reference manual prescribes." *Id.* at ¶ 9. We agree. The state argues that *Huber* is distinguishable based on the existence of Schad's expert testimony in this case, but Schad did not testify "as to what a standard pharmaceutical reference manual prescribes" as the maximum daily dose in the usual dose range for fentanyl. *See id.* So, we conclude that as in *Huber*, the state did not prove the maximum daily dose in the usual dose range for fentanyl.

**{¶ 31}** Before the court of appeals, the state argued that this case is analogous to *Bange*, 4th Dist. Ross No. 10CA3160, 2011-Ohio-378. In *Bange*, the Fourth District affirmed a conviction for aggravated possession of extended-release Oxycodone tablets even though the testifying pharmacist relied on the usual dose range for *nonextended-release* Oxycodone tablets to determine the bulk amount. The AHFS contained separate listings, with different usual dose ranges, for extended-release and nonextended-release Oxycodone tablets. The nonextended-release listing stated a usual adult dose of "2 to 15 mg every 4 to 6 hours," whereas the extended-release listing stated, "[d]osage must be individualized by the physician according to the severity of pain and patient response." (Brackets sic.) *Id.* at ¶ 11-12. The Fourth District rejected Bange's sufficiency and manifest-weight challenges. It recognized, "[I]t is not clear whether the [extended-release] listing even provides a maximum usual daily dose," and held, "Under these circumstances, we see no reason why a pharmacist cannot determine that another listing provides a sufficient basis for stating the maximum daily dose in the usual dose range." *Id.* at ¶ 20. Whether or not we would have reached the same conclusion as the Fourth District, its approval of the use of a specified dose range for another form of Oxycodone in *Bange* does not justify the use of the usual dose

range for morphine—an entirely different drug—to determine the bulk amount of fentanyl.

{¶ 32} The issue in this case is not Schad's credibility or the persuasiveness of his testimony. Rather, the issue is whether Schad's testimony satisfies the statutory definition of "bulk amount," that is, whether he testified to a maximum daily dose in the usual dose range for fentanyl specified in a standard pharmaceutical reference manual. We hold that he did not.

{¶ 33} The Eighth District's decision, which we affirm here, recognizes that the state cannot prove a "bulk amount" of fentanyl patches under the dosage prong of R.C. 2925.01(D)(1)(d) because the AHFS does not specify a maximum daily dose in the usual dose range for fentanyl patches. The General Assembly made the policy decision to tie the degree of offense for aggravated possession of Schedule II controlled substances, like fentanyl, to the bulk amount rather than to weight or unit doses, as it did with other controlled substances. And because the AHFS, which Schad relied on, does not state a maximum daily dose in the usual dose range for transdermal fentanyl, the state is unable to prove the "bulk amount" under the current statutory scheme. So, without a standard pharmaceutical reference manual that specifies the maximum daily dose in the usual dose range for transdermal fentanyl, possession of less than 20 grams of transdermal fentanyl will be a fifth-degree felony under R.C. 2925.11(C)(1)(a) unless and until the General Assembly amends the statutory framework for assigning enhanced felony levels to offenses involving possession of fentanyl.

{¶ 34} Pountney accurately notes that there is a bill pending before the General Assembly that proposes changes to the statutory scheme addressing the escalation of penalties for possession of fentanyl. 2017 Am.Sub.S.B. No. 1 proposes to anchor escalation of penalties for fentanyl possession to "unit doses" instead of "bulk amount." *Id.* The Senate passed the bill on March 29, 2017, and it has been before the House Criminal Justice Committee since May 9, 2017. Ohio

Legislature, 132nd General Assembly, Senate Bill 1, Status, https://www.legislature.ohio.gov/legislation/legislation-status?id=GA132-SB-1. But unless and until the General Assembly acts, our role is to apply the current statutory scheme as enacted. And in doing so, we must affirm the Eighth District's judgment.

### *Conclusion*

**{¶ 35}** R.C. 2925.01(D)(1)(d) defines the "bulk amount" of fentanyl as "five times the maximum daily dose in the usual dose range specified in a standard pharmaceutical reference manual." However, the AHFS, the standard pharmaceutical reference manual used in this case, does not specify a maximum daily dose in the usual dose range for fentanyl. Therefore, it does not provide a basis for proving the "bulk amount" under the statute. Although the AHFS states that an initial dose of transdermal fentanyl should take into account a patient's opiate tolerance and the type and dose of opiate therapy the patient is being transferred from, neither R.C. 2925.01(D)(1)(d) nor the AHFS justifies reliance on the usual dose range of morphine to establish the bulk amount of fentanyl. For these reasons, we reject the state's proposition of law and affirm the Eighth District's judgment.

Judgment affirmed.

O'CONNOR, C.J., and O'DONNELL, KENNEDY, O'NEILL, FISCHER, and DEWINE, JJ., concur.

_____

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Christopher D. Schroeder, Assistant Prosecuting Attorney, for appellant.

Mark A. Stanton, Cuyahoga County Public Defender, and John T. Martin, Assistant Public Defender, for appellee.

Michael DeWine, Attorney General, Eric E. Murphy, State Solicitor, and Hannah C. Wilson, Deputy Solicitor, urging reversal for amicus curiae, Ohio Attorney General Michael DeWine.

_____