[Cite as *State v. Miller*, 2019-Ohio-3294.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 28284 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-3126 |
| | : | |
| JOSEPH LEE MILLER | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 16th day of August, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellant

SUSAN F. SOUTHER, Atty. Reg. No. 0058529, Assistant Montgomery County Public Defender, 117 South Main Street, Suite 400, Dayton, Ohio 45422
        Attorney for Defendant-Appellee

. . . . . . . . . . . . .

TUCKER, J.

{¶ 1} This case is before us on the appeal of the State of Ohio from an order dismissing the indictment against Defendant-Appellee, Joseph Miller. According to the State, the trial court erred in granting Miller's motion to dismiss the indictment because the immunity provision in R.C. 2925.11(B)(2)(b) for persons receiving medical assistance as a result of a drug overdose does not apply to this case.

{¶ 2} We conclude that the trial court erred in part in dismissing the indictment. The immunity that R.C. 2925.11(B)(2)(b) provides does not apply to prosecution of offenses that occur prior to the individual's overdose, nor does it apply to charges that are not listed in R.C. 2925.11(B)(2)(b). However, the trial court did not err in dismissing a drug possession charge based on drugs that were found after Miller was taken to the hospital, even if the drugs could have been discovered in a routine search at the jail or pursuant to a search done incident to Miller's arrest on other charges. R.C. 2925.11(B)(2)(b)(i) is unambiguous and provides immunity for possession of drugs that are discovered as a result of obtaining medical assistance for an overdose, which is what occurred in this case. Accordingly, the trial court's order will be reversed in part and affirmed in part, and this cause will be remanded for further proceedings.

## I. Facts and Course of Proceedings

{¶ 3} In October 2018, the State filed an indictment charging Miller with five counts, including two counts of possession of fentanyl, one count of possession of methamphetamine, one count of falsification (public official), and one count of possession of drug abuse instruments. These charges involved, respectively, three fifth-degree felonies, a first-degree misdemeanor, and a second-degree misdemeanor. After

pleading not guilty, Miller filed a motion to dismiss the indictment based on the fact that he was a "qualified individual" under R.C. 2925.11(B)(2) and was immune from prosecution.

{¶ 4} The State responded to the motion, and the trial court then issued an order dismissing the indictment. The court did not hold an evidentiary hearing, but relied on the content in Exhibit A, to which the parties had stipulated.

{¶ 5} According to Exhibit A, Miamisburg Police Officer Benjamin Carter was on routine road patrol on May 26, 2018, at around 7:56 p.m., when he stopped a 2002 Ford truck for a muffler violation. After contacting the driver and informing her of the violation, Carter obtained her driver's license. He also asked the front-seat passenger, Miller, for identification. Miller said that he did not have his ID; he gave Carter the name of Charles Coatney, a social security number, and a birthdate. A check of the social security number yielded negative results, and a name search turned up a social security number that was one digit off from the one Miller provided and a birthdate for a much older man. When Carter checked with Miller again, Miller gave him the same social security number and said he was from Tennessee. However, Tennessee records for the Coatney name also yielded negative results.

{¶ 6} Carter had prior contact with Miller and thought he looked familiar. Because he believed Miller was providing false information, Carter removed him from the car and placed him in custody for obstructing official business. Carter then asked Miller if he had anything illegal, and Miller said he had a syringe in his right front pocket. After retrieving the syringe, Carter inspected it and found that it contained an unknown liquid. As a result, Carter placed Miller in the back seat of his cruiser. He then discovered that Miller

was the subject of an outstanding felony warrant. After Carter gave Miller *Miranda* rights, Miller stated that he had lied because he had an outstanding warrant. Miller also said the syringe contained heroin.

{¶ 7} Carter then began to transport Miller to the Montgomery County Jail. However, Miller stated that he was going to vomit. When Carter pulled over and exited the patrol car, Miller said he had swallowed a half gram of heroin. Carter called for a medic, and when other officers came to assist, Miller was breathing but was not responsive. Another officer administered a dose of Narcan, and shortly thereafter, medics arrived on the scene and transported Miller to Sycamore Medical Center for further evaluation.

{¶ 8} Carter also went to the hospital and informed the hospital that Miller had an outstanding warrant. Subsequently, the police faxed a copy of the detainer to hospital security, which said the police would be notified when Miller was discharged. Carter then left, after giving Miller a summons and court dates for obstructing official business and possession of drug abuse instruments.

{¶ 9} Shortly after Carter left, hospital security contacted the police and said that drugs had been located on Miller's person. At that point, Carter returned to the hospital, where he learned that the doctor had noticed that Miller remained in a fetal position during the examination. When Miller's clothes were removed, a security officer, Officer Daymon, located two plastic baggies containing an unknown white powdery substance. Daymon placed the two baggies in a larger plastic bag, and then gave the bag to Carter. Carter booked the baggies as well as the syringe into evidence and sent them to the Miami Valley Regional Crime Lab for analysis.

{¶ 10} After testing, the lab found that the syringe contained fentanyl and methamphetamine, with a total weight of .12 grams. Each plastic bag contained fentanyl, with the total weight of the two bags being .16 grams. As noted, Miller was subsequently indicted on five charges relating to these events, and the trial court dismissed the indictment. The State then appealed from the dismissal of the indictment.

## II.    Does R.C. 2929.11(B)(2)(b) Apply to this Case?

{¶ 11} The State's sole assignment of error states that:

> The Trial Court Erred in Granting Miller's Motion to Dismiss. R.C. 2925.11(B)'s Immunity Provision Had No Application to Miller's Case

{¶ 12} Under this assignment of error, the State addresses two types of charges: those occurring before Miller's overdose, and one resulting from the discovery of drugs at the hospital. According to the State, charges based on events occurring before Miller's overdose did not result from his overdose within the meaning of R.C. 2925.11(B)(2)(b). In addition, the State contends that charges based on discovery of drugs after Miller's overdose did not result from an overdose for purposes of the immunity statute, because the drugs would inevitably have been discovered during a search incident to arrest or a routine search at the jail.

{¶ 13} A de novo standard of review has been applied to decisions interpreting R.C. 2925.11(B), because "the correct interpretation of a statute is a question of law subject to de-novo review." *State v. Simmons*, 2018-Ohio-2018, 112 N.E.3d 327, ¶ 18 (4th Dist.), citing *State v. Pountney*, 152 Ohio St.3d 474, 2018-Ohio-22, 97 N.E.3d 478, ¶ 20. (Other citation omitted.) In this situation, appellate courts do not defer to a trial

court's interpretation. *Id.* Furthermore, appellate courts generally apply de novo review when reviewing trial court decisions to dismiss indictments. *State v. Brown*, 2018-Ohio-2267, 114 N.E.3d 228, ¶ 12 (4th Dist.). With these standards in mind, we will consider each set of charges.

### A. Charges Based on Events Occurring Before the Overdose

{¶ 14} According to the State, four of the five counts of the indictment were based on events that occurred before the overdose. These charges included falsification, possession of drug instruments, possession of methamphetamine, and one count of possession of fentanyl (the latter two charges being based on the fact that the syringe contained both fentanyl and methamphetamine). In responding to the State's arguments, Miller concedes that the charges of falsification and possession of drug abuse instruments were not subject to dismissal under R.C. 2925.11(B)(2)(b). However, Miller argues that the trial court had authority to dismiss those charges pursuant to Crim.R. 48(B).

{¶ 15} Ohio's 911 Good Samaritan Law, as outlined in R.C. 2925.11(B)(2)(b), provides that:

> Subject to division (B)(2)(f) of this section, a qualified individual shall not be arrested, charged, prosecuted, convicted, or penalized pursuant to this chapter for a minor drug possession offense if all of the following apply:
>
> (i) The evidence of the obtaining, possession, or use of the controlled substance or controlled substance analog that would be the basis of the offense was obtained as a result of the qualified individual seeking the

medical assistance or experiencing an overdose and needing medical assistance.

(ii) Subject to division (B)(2)(g) of this section, within thirty days after seeking or obtaining the medical assistance, the qualified individual seeks and obtains a screening and receives a referral for treatment from a community addiction services provider or a properly credentialed addiction treatment professional.

(iii) Subject to division (B)(2)(g) of this section, the qualified individual who obtains a screening and receives a referral for treatment under division (B)(2)(b)(ii) of this section, upon the request of any prosecuting attorney, submits documentation to the prosecuting attorney that verifies that the qualified individual satisfied the requirements of that division. The documentation shall be limited to the date and time of the screening obtained and referral received.

{¶ 16} R.C. 2925.11(B)(2)(a)(iv) defines a "minor possession offense" as "a violation of this section [R.C. 2925.11] that is a misdemeanor or a felony of the fifth degree." In addition, R.C. 2925.11(B)(2)(e)(1) specifically prohibits limiting "the admissibility of any evidence * * * with regards to any crime other than a minor drug possession offense committed by a person who qualifies for protection pursuant to division (B)(2)(b) of this section for a minor drug possession offense."

{¶ 17} Based on these definitions, which have been found to be unambiguous, court have held that the immunity offered by R.C. 2925.11(B)(2)(b) does not apply to violations other than minor drug possession offenses covered in R.C. 2925.11. For

example, there is no immunity for possession of drug paraphernalia and possession of drug abuse instruments. *City of Akron v. Pari*, 9th Dist. Summit No. 29029, 2019-Ohio-1083, ¶ 6-7 (no immunity for violations of city ordinances barring possession of drug paraphernalia and drug abuse instruments); *City of Akron v. Brown*, 2018-Ohio-4500, 122 N.E.3d 672, ¶ 10 (9th Dist.) (same holding).

{¶ 18} Accordingly, we agree with the State and Miller that the trial court erred in dismissing the charges of falsification and possession of drug abuse instruments, as neither crime fits within the definition of a minor possession offense in R.C. 2925.11(B)(2)(a)(iv). As noted, however, Miller contends that the trial court properly dismissed these charges based on authority given to it under Crim.R. 48(B).

{¶ 19} "The Ohio Supreme Court has recognized that a trial court may dismiss an indictment under Crim.R. 48(B) when 'dismissal serves the interests of justice.' " *State v. Harris*, 186 Ohio App.3d 359, 2010-Ohio-837, 928 N.E.2d 456, ¶ 7 (2d Dist.), quoting *State v. Busch*, 76 Ohio St.3d 613, 615, 669 N.E.2d 1125 (1996). In this type of situation, we review a court's decision for abuse of discretion. *Busch* at 616. An " 'abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable. * * * It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 20} In the case before us, the trial court's decision was based on unsound reasoning. Crim.R. 48(B) provides that "[i]f the court over objection of the state dismisses an indictment, information, or complaint, it shall state on the record its findings

of fact and reasons for the dismissal." The trial court, therefore, did have authority to dismiss the charges. However, the court failed to state any findings of fact and reasons for the dismissal, other than referring to the immunity under R.C. 2925.11(B)(2)(b). This was incorrect because the immunity statute did not apply to the falsification and possession of drug abuse instrument charges. Accordingly, the trial court erred in dismissing these charges.

{¶ 21} With respect to the fentanyl and methamphetamine charges, the State contends that the contents of the syringe could not be the result of a qualified individual experiencing an overdose and needing medical assistance under R.C. 2925.11(B)(2)(b)(i) because the overdose had not yet happened when the syringe was discovered. In response, Miller contends that the State's interpretation is erroneously narrow, and that the legislature expansively defined "as a result of" in the statute.

{¶ 22} As noted, R.C. 2925.11(B)(2)(b) allows immunity from arrest, prosecution, conviction, or penalization if all of several requirements are met, including that "[t]he evidence of the obtaining, possession, or use of the controlled substance or controlled substance analog that would be the basis of the offense was obtained as a result of the qualified individual seeking the medical assistance or experiencing an overdose and needing medical assistance." R.C. 2925.11(B)(2)(b)(i).[1]

{¶ 23} The principle is well-settled that where a statute defines the terms it uses, this definition controls in applying the statute. *Stewart v. Vivian*, 151 Ohio St.3d 574, 2017-Ohio-7526, 91 N.E.3d 716, ¶ 25. However, if terms are undefined, they are given

---

[1] The State concedes that Miller met the rest of the immunity requirements in R.C. 2925.11(B)(2)(b).

their "common everyday meaning." *Id.*, citing R.C. 1.42.

{¶ 24} Contrary to Miller's contention, the legislature did not define the term "as a result of." Consequently, we apply the common everyday meaning. "Result" (used as a noun) is defined as "1: something that results as a consequence, issue, or conclusion *also*: beneficial or tangible effect: FRUIT. 2: something obtained by calculation or investigation." *See* https://www.merriam-webster.com/dictionary/result. (accessed Aug. 14, 2019).

{¶ 25} Seizure of the syringe did not result from Miller's experiencing an overdose and receiving assistance. Instead, the seizure resulted from a traffic stop and Miller's provision of false information to the police. These events all occurred before the overdose manifested.

{¶ 26} In a somewhat similar situation, we rejected immunity claims. Specifically, in *State v. Hagen*, 2d Dist. Champaign No. 2018-CA-2, 2018-Ohio-4045 (2d Dist.), a police officer had been dispatched at around 11:00 a.m., based on a report that a person was slumped over the steering wheel of a car. *Id.* at ¶ 2. Emergency personnel knocked on the car window and asked if the person was alright. The defendant (Hagan) "immediately turned off the engine, exited the car, told the EMTs he was fine, and began to walk to the house adjacent to where the car was parked." *Id.* Hagan continued to assure both a police officer and EMT personnel that he was not having medical issues and did not need medical assistance; he said, instead, that he had given a friend a ride to the address where the car was parked and fell asleep in the car around 4:00 a.m. *Id.*

{¶ 27} The police officer did not believe that Hagen was having an overdose or that he exhibited any signs of an overdose, despite the fact that the officer noticed needle

marks on Hagan's arm.   Hagan told the officer that he had gotten the car from another man, but did not know his real name.   However, dispatch confirmed that the car belonged to a woman in her 60's.   In addition, the officer was aware that the adjacent residence was a site of suspected drug activity.   *Id.* at ¶ 3-4.   Due to all these factors, the officer asked Hagan if he could look inside the car, and Hagan consented.   When the officer looked inside the rear window, he saw a small red baggy indicative of drug transport.   The officer also opened the car door and smelled marijuana.   The ensuing search revealed various drugs, a used syringe, and a backpack containing drugs and drug paraphernalia.   *Id.* at ¶ 5.

{¶ 28} Hagan declined medical treatment and was taken to the police station, where he confirmed that the backpack was his and that he had been using cocaine and heroin the previous night.   However, he denied overdosing and said he had just been tired.   *Id.* at ¶ 7.

{¶ 29} After being indicted for several drug possession charges as well as other charges, Hagen filed a demand for immunity, alleging that he was entitled to immunity on the drug-related charges.   *Id.* at ¶ 9-11.   After holding an evidentiary hearing, the trial court denied immunity; Hogan then pled no contest to two counts of drug possession and guilty to two unrelated charges.   *Id.* at ¶ 17.   Subsequently, Hagen appealed, contending that he was entitled to immunity under R.C. 2925.11(B)(2)(b).   *Id.* at ¶ 20.

{¶ 30} We affirmed the trial court's decision.   First, we noted that the record compelled "a conclusion that the evidence on which Hagen's drug possession charges were premised was *not* acquired as a result of Hagen's 'experiencing an overdose and needing medical assistance.' " (Emphasis sic.)   *Id.* at ¶ 26, quoting R.C.

2925.11(B)(2)(b)(i). This was based on the trial court's credibility decision, which rejected Hagen's contention he had, in fact, overdosed that night. Among other things, this contradicted everything Hagen told the police at the time. *Id.* at ¶ 27-28. We also remarked that even if we accepted Hagen's testimony, the record lacked any evidence that he needed medical assistance as a result of an overdose. *Id.* at ¶ 29-30.

{¶ 31} We summarized our final observation as follows:

Finally, the trial court's credibility assessments lead to the conclusion that the evidence underlying Hagen's drug possession charges was obtained not as a result of Hagen's overdosing or needing medical assistance, but instead as a product of Hagen's consent to Officer Hughes's search of the vehicle. Again, we defer to the trial court's finding that Officer Hughes's testimony regarding Hagen's consent to the vehicle search was more credible than Hagen's denial that he consented. * * * Like the trial court, we conclude that any possible "medical incident" inferable from the circumstances surrounding Hagen's arrest had been resolved or "terminated" before Officer Hughes sought Hagen's consent to the vehicle search.

(Emphasis added.) *Id.* at ¶ 31.

{¶ 32} Although Hagen's factual situation differs from the case before us, the underlying principles are similar. As noted, Miller's arrest for falsification and possession of drug abuse instruments (and the ensuing charges of possession of fentanyl and methamphetamine) was complete or had terminated *before* Hagan needed medical assistance for an overdose. Therefore, the trial court erred in dismissing these drug

possession charges against Miller, because Miller did not meet the requirements of R.C. 2925.11(B)(2)(b).

### B. Events Occurring After the Arrest

{¶ 33} The remaining charge pertains to the fentanyl that was seized at Sycamore Medical Center. According to the State, there was no cause and effect relationship between the overdose and the discovery of the drugs, because the fentanyl would have been discovered either through a search incident to arrest or a routine inventory search at the jail. Again, Miller contends that the State's interpretation is too narrow.

{¶ 34} In considering this issue, we have reviewed all the Ohio cases dealing with R.C. 2925.11(B)(2)(b). None of these cases has addressed the specific situation before us. Upon reviewing the statute in its entirety, we conclude that R.C. 2925.11(B)(2)(b)(i) is unambiguous and does not create the exception the State suggests.

{¶ 35} "In construing a statute, the court's paramount concern is legislative intent. * * * 'In determining legislative intent, the court first looks to the language in the statute and the purpose to be accomplished.' If the meaning of the statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary." *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.*, 74 Ohio St.3d 543, 545, 660 N.E.2d 463 (1996), quoting *State v. S.R.*, 63 Ohio St.3d 590, 594-595, 589 N.E.2d 1319 (1992). (Other citations omitted.)

{¶ 36} "Ambiguity exists only if the language of a statute is susceptible of more than one reasonable interpretation, and the facts and circumstances of a case do not permit a court to read ambiguity into a statute." *Brown*, 2018-Ohio-4500, 122 N.E.3d

672, at ¶ 6, citing *Dunbar v. State*, 136 Ohio St.3d 181, 2013-Ohio-2163, 992 N.E.2d 1111, ¶ 16. "Thus, inquiry into legislative intent, legislative history, public policy, the consequences of an interpretation, or any other factors identified in R.C. 1.49 is inappropriate absent an initial finding that the language of the statute is, itself, capable of bearing more than one meaning." *Dunbar* at ¶ 16.

{¶ 37} As to the purpose of the immunity statute, we have previously commented that "the 'crisis in opioid deaths has reached epidemic proportions in the United States (33,091 in 2015), and currently exceeds all other drug-related deaths or traffic fatalities.' " *State v. Melms*, 2018-Ohio-1947, 101 N.E.3d 747, ¶ 2 (2d Dist.), quoting Report: Governor Chris Christie, *The President's Commission on Combating Drug Addiction and the Opioid Crisis*, Washington, D.C., November 1, 2017, p. 31. In *Melms*, the State also agreed that " 'the policy objectives of the immunity provision are laudable; addressing the opioid crisis of this region is a worthy cause.' " *Id.* at ¶ 22, quoting from the State's Brief.

{¶ 38} Furthermore, the language in the pertinent part of the statute is not ambiguous. R.C. 2925.11(B)(2)(b)(i) does not say that immunity fails if the evidence would have been obtained later as the result of a search incident to arrest or from a routine jail inventory search. If the legislature intended such restrictions, it knew how to do so. Instead, the only qualification was that "[t]he evidence * * * was obtained as a result of the qualified individual seeking the medical assistance or experiencing an overdose and needing medical assistance." R.C. 2925.11(B)(2)(b)(i). That, in fact, is what occurred here, under the definition of "result" noted above, i.e., "something that results as a consequence. . . ."

{¶ 39} Other states use "result" language similar to Ohio's statute. *See* Fla.

Stat.Ann. 893.21(2); Haw.Rev.Stat.Ann. 329-43.6(b); La.Stat.Ann. 14:403.10(B); Nev.Rev.Stat.Ann. 453C.150.1(d); N.J.Stat.Ann. 2C:35-30(b)(2); N.M.Stat.Ann. 30-31-27.1.B; R.I.Gen.Laws Ann. 21-28.9-4(b); S.C.Code Ann. 44-53-1930(A); and Wash.Rev.Code Ann. 69.50.315(2). While the authority is sparse, the cases mainly focus on whether the defendant actually experienced an overdose. *See, e.g.*, *State v. Silliman*, 168 So.3d 245, 247 (Fla.App.2015) (defendant did not show signs of overdose); *State v. Jago*, 228 So.3d 1218 (La.2017) (a life-threatening overdose is not required for application of the statute); *State v. Osborn*, Wash. Div.1 No. 77783-1, 2019 WL 1643800, *2 (Apr. 15, 2019) (no medical treatment was given and the defendant did not experience an overdose).

**{¶ 40}** In New Jersey, in a case of first impression, the court concluded that:

> Each of the immunity provisions explicitly limits the statute's protection to criminal charges that are based on evidence "obtained as a result of the seeking of medical assistance." N.J.S.A. 2C:35–30(b)(2) and -31(b). Hence, incriminating evidence that law enforcement officials obtain by other means, such as the fruits of a search warrant or a constitutional warrantless search, *unconnected from someone's attempt to seek medical assistance for an individual perceived to be experiencing a drug overdose*, is beyond the immunity's reach.

(Emphasis added.) *State v. W.S.B.*, 453 N.J.Super. 206, 224-25, 180 A.3d 1168 (2018).

**{¶ 41}** In the case before us, discovery was not unconnected to the attempt to seek medical assistance for a person perceived to be experiencing a drug overdose. Moreover, we have found no authority in these jurisdictions that applies the language in

the way the State suggests. The State has also not cited any such authority from these jurisdictions.

{¶ 42} Notably, other states have included language that is more explicit and may suggest a different result (a point on which we express no opinion). For example, Maryland and Georgia require that "the evidence for the criminal arrest, charge, or prosecution was obtained *solely* as a result of the person seeking or receiving medical assistance." (Emphasis added.) Md.Code Ann., Crim.Proc. 1-210(b); Ga.Code Ann. 16-13-5(b); *see also* N.H.Rev.Stat.Ann. 318-B:28-b III (allowing a defense to prosecution "if the evidence for the charge was gained as a *proximate* result of the request for medical assistance" (Emphasis added.)).

{¶ 43} Other states' laws are even more explicit. For example, in Iowa, to qualify as "protected information" (which cannot serve as evidence against an overdose patient), several conditions must exist, including that "[m]edical assistance was not sought during the execution of an arrest warrant, search warrant, or other lawful search." Iowa Code Ann. 124.418.1((d)(2)(f). Minnesota's statute also provides that "[n]othing in this section shall: * * * preclude prosecution of a person on the basis of evidence obtained from an independent source." Minn.Stat.Ann. 604A.05. Subd. 4(b)(2). *See also* 35 Pa. Stat.Ann. 780-113.7(d)(1) ("[t]his section may not bar charging or prosecuting a person for offenses enumerated in subsection (b) if a law enforcement officer obtains information prior to or independent of the action of seeking or obtaining emergency assistance as described in subsection (a)"); Vt.Stat.Ann. tit. 18, 4254(g) ("[t]he immunity provisions of this section apply only to the use and derivative use of evidence gained as a proximate result of the person's seeking medical assistance for a drug overdose, being the subject

of a good faith request for medical assistance, being at the scene, or being within close proximity to any person at the scene of the drug overdose for which medical assistance was sought and do not preclude prosecution of the person on the basis of evidence obtained from an independent source").

{¶ 44} Kentucky also precludes a finding of good faith for purposes of obtaining medical assistance for an overdose where the assistance is sought "during the course of the execution of an arrest warrant, or search warrant, or a lawful search." Ky.Rev.Stat.Ann. 218A.133(1)(b). As noted, the Ohio General Assembly could have chosen other language, but did not, and R.C. 2925.11(B)(2)(b)(i) is also not ambiguous.

{¶ 45} In its brief, the State imagines a scenario in which traffickers can evade prosecution for crimes by relying on overdoses. However, other states have precluded this in their statutes. *See* Mass.Gen.Laws Ann. 94C 34(d) ("[n]othing contained in this section shall prevent anyone from being charged with trafficking, distribution or possession of a controlled substance with intent to distribute"); Mich.Comp.Laws Ann. 333.7403(3) (limiting protection to persons whose overdoses arise "from the use of a controlled substance or a controlled substance analogue that he or she possesses or possessed *in an amount sufficient only for personal use*" (Emphasis added.)); NY PENAL 220.78(2) (allowing immunity for crimes "other than an offense involving sale for consideration or other benefit or gain"). Again, the Ohio General Assembly could have added such provisions, if it felt the need to do so.

{¶ 46} Accordingly, we conclude that the trial court did not err in dismissing the indictment for possession of the fentanyl that was discovered after Miller was taken to the hospital for treatment. The State's sole assignment of error, therefore, is sustained in

part and is overruled in part.

## IV.   Conclusion

**{¶ 47}** Having sustained the State's sole assignment of error in part and overruled it in part, the judgment of the trial court is affirmed in part and reversed in part, and this cause is remanded to the trial court for further proceedings.

. . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Heather N. Jans
Susan F. Souther
Hon. Richard Skelton