[Cite as *State v. Crowe*, 2020-Ohio-1314.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                    CASE NO. 13-19-41

    v.

BRANDON J. CROWE,                    O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 18 CR 0144

Judgment Affirmed

Date of Decision: April 6, 2020

APPEARANCES:

    *Jennifer L. Kahler* for Appellant

    *Rebeka Beresh* for Appellee

**SHAW, P.J.**

{¶1} Defendant-appellant, Brandon J. Crowe ("Crowe"), brings this appeal from the September 25, 2019, judgment of the Seneca County Common Pleas Court sentencing him to twenty-four months in prison after Crowe was found guilty by a jury of Tampering with Evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree. On appeal, Crowe argues that there was insufficient evidence presented to convict him and that his conviction was against the manifest weight of the evidence.

*Background*

{¶2} On July 11, 2018, Crowe was indicted for Tampering with Evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree. It was alleged that Crowe concealed or removed his girlfriend's cell phone after she overdosed and died while the police investigated the matter or were likely to investigate the matter, with purpose to impair the phone's value or availability as evidence. Crowe entered a plea of not guilty to the charge.

{¶3} The matter proceeded to a jury trial, which was held August 21-22, 2019. Following the presentation of evidence, Crowe was found guilty of Tampering with Evidence as charged.

{¶4} On September 24, 2019, Crowe was sentenced to serve twenty-four months in prison, consecutive to his prison term on an unrelated Involuntary

Manslaughter conviction from another county. A judgment entry memorializing Crowe's sentence was filed September 25, 2019. It is from this judgment that Crowe appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The trial court erred in finding appellant guilty of Tampering with Evidence when the conviction was against the manifest weight of the evidence.**

**Assignment of Error No. 2**
**The trial court erred in finding appellant guilty of Tampering with Evidence where the State failed to introduce sufficient evidence to support the conviction.**

{¶5} We elect to address the assignments of error out of the order in which they were raised.

*Second Assignment of Error*

{¶6} In Crowe's second assignment of error, he argues that there was insufficient evidence presented to convict him of Tampering with Evidence.

Standard of Review

{¶7} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly,

"[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.); *see also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997) ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence.").

Controlling Statute

{¶8} In this case, Crowe was convicted of Tampering with Evidence in violation of R.C. 2921.12(A)(1), which reads as follows.

> **(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:**
>
> **(1)  Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]**

Evidence Presented

{¶9} In order to convict Crowe at trial, the State presented evidence that in Melmore, Ohio, around 1:30 a.m. on January 3, 2018, Crowe awakened on the

couch with his girlfriend, Ashley, in his lap. Ashley had vomited and she was unresponsive. Crowe called Ashley's mother, who lived only a couple blocks away, and told her that Ashley was unresponsive and that Crowe thought Ashley was not breathing.

{¶10} Ashley's mother, Pam, was aware that Ashley had a history of substance abuse. Ashley had been in and out of rehab and Pam was also aware that Ashley had recently been drinking. Ashley was twenty-six years old at the time. Pam had last seen Ashley on New Year's Day, two days prior. Pam thought Ashley might have passed out from drinking, so she sent her husband Ryan—Ashley's step-father—to check on Ashley.[1]

{¶11} Ryan hurriedly ran over to Ashley's residence. When he arrived, Crowe was on the porch and Crowe stated that he could not awaken Ashley. Ryan went inside and observed Ashley on the couch. She was, as Crowe had stated, not breathing and unresponsive, but she was still warm to the touch. Ryan called Pam, then 911 was called, and Ryan performed CPR on Ashley.

{¶12} A Deputy Sheriff, Troy Gibson, was dispatched to the residence for a report of an unresponsive female at 1:39 a.m. He was the first responder at the scene. When Deputy Gibson arrived, he was met at the door and led to Ashley, where he checked her vitals then relieved Ryan from performing CPR. Deputy

---

[1] Ashley lived in a home that was owned by Pam and Ryan. Pam testified their houses were close, approximately two blocks apart, Ryan testified that the houses were perhaps three or four blocks apart.

Gibson continued performing CPR until further emergency responders arrived. Pam arrived at the residence while Deputy Gibson was performing CPR.

{¶13} EMTs transported Ashley to the hospital. Pam followed the EMTs but Crowe and Ryan assisted police officers at the scene as the officers looked for any drugs or drug paraphernalia that would help explain Ashley's condition. The officers also looked for Ashley's cell phone, hoping it could provide information to possibly explain what had happened to her. An officer stated that the cell phone would be a valuable investigative tool to help provide a timeline leading to Ashley's condition, or if her condition was the result of an overdose, where she may have obtained narcotics. The officer figured that a young woman would not be far from her cell phone. In fact, Pam and Ryan testified that Ashley's phone was always within reach and that she was a "selfie" queen.

{¶14} However, Ashley's cell phone was also not located during the search of the residence or her vehicle, which one officer stated was atypical. Brandon specifically told the officers that he did not know the location of Ashley's cell phone.

{¶15} In addition, no drugs or paraphernalia were located during the search of the residence or vehicle. A detective testified that it was uncommon in an

overdose situation to have no drugs or drug paraphernalia around and that it was something that warranted further investigation.[2]

{¶16} After the search of the residence and Ashley's vehicle, Ryan took Crowe to the hospital, though they stopped at Pam and Ryan's house on the way. When they arrived at the hospital, they learned that Ashley had been pronounced dead. Ashley's blood was drawn to have it examined to help in determining the cause of her death.

{¶17} Deputy Gibson asked Crowe to come and speak with him after Crowe left the hospital. Crowe went to the Sheriff's Office, was interviewed, and he made a written statement, which Crowe finished at approximately 4:30 a.m. on January 3, 2018. Crowe was then driven to the residence of one of his family members in Marion by Ashley's brother as Crowe did not have a vehicle.

{¶18} Much later on the same day, after 6:30 p.m., Crowe made a phone call to Pam, which Pam recorded. On the call Pam and Crowe initially spoke of their shock and sadness over Ashley's death, then Crowe spoke about Ashely's absent cell phone. Despite earlier telling the police he had no idea where Ashley's phone was located, Crowe told Pam that Crowe remembered having the phone on his lap in Ryan's truck (presumably on the way to the hospital), then he thought he placed Ashley's phone outside of Pam's residence by the garage. Pam told Crowe that she

---

[2] At one point Brandon indicated that he thought the last time Ashley had used heroin was eight days prior.

wanted the phone because it had numerous pictures of Ashley and Pam was preparing for Ashley's funeral.

{¶19} While Pam was on the phone with Crowe, Ryan went outside to look for the cell phone in the area Crowe said he had dropped it. Ryan could not locate the phone. Pam told Crowe that Ryan could not find the phone and then Pam told Crowe to let her know if he could think of any possibility where Ashley's phone was located. Crowe stated that he would, and the call was ended after approximately ten minutes. Pam testified that she recorded her conversation with Crowe because Crowe's statements were not making sense to her, and she suspected Crowe had Ashley's phone.

{¶20} A couple of days later a service was held for Ashley, which Crowe attended. The following morning Ashley was buried. Crowe did not attend the funeral; however, after the funeral Crowe exchanged text messages with Pam about potentially visiting Ashley's gravesite. Crowe did not know where the gravesite was located. One of the messages Crowe sent stated as follows.

> **I'm very sorry I wasn't able to be there I'm so fucked up over it bc I really needed to be there. Yes thank you I would really like to do that sometime soon. It would really mean a lot to me. As far as the phone I have looked everywhere through all my stuff and haven't found it. The last time I remember seeing it I had it on my lap when I was in Ryan's truck leaving her house and I think I dropped it at either your house or the hospital when I got out. But I'll keep looking until I find it bc it also has all the pictures she took of us as well and I really need to see them again.**

> **I miss her so much I just keep staring at my phone wishing she would call me**

(State's Exs. 3-4).

{¶21} Pam agreed to take Crowe to Ashley's gravesite on January 10, 2018, and she did take him there. After Crowe took flowers to the grave, Crowe indicated that he had some personal possessions in Ashley's vehicle and at her residence. Crowe was taken to Ashley's residence where he gathered some of his possessions. Nobody saw Crowe pick up a cell phone at that time.

{¶22} On January 11, 2018, a detective investigating the matter received a warrant to check the GPS locations on Ashley's phone from January 3, 2018, to January 10, 2018. The search did not reveal any results, indicating that the last place Ashley's phone had been was at her residence on or about January 3, 2018, just after 7:30 a.m. A detective indicated that a phone that was turned off would not transmit GPS data, potentially accounting for no GPS data during any of the other days.

{¶23} Also on January 11, 2018, Crowe was arrested on an unrelated matter by the Marion Police Department. Crowe's phone was seized and searched at that time. From the search of Crowe's phone, it was learned that over thirty pictures had been exchanged between Ashley's phone and Crowe's phone on the morning of January 11, 2018, around 7 a.m., which would have been over a week after Ashley's death. Some of the photos were of Ashley—including some topless photos—and some were of Ashley and Crowe. The fact that photographs had been exchanged

with Ashley's missing phone was relayed to the Seneca County Sheriff's Department. A new warrant was then obtained to get the GPS location for Ashley's phone for days spanning January 11, 2018, to January 22, 2018.

{¶24} The search warrant was conducted and there was a GPS location for Ashley's phone at the residence of Crowe's father on January 11, 2018. Crowe's father's residence was searched and Ashley's phone was located in Crowe's room, tucked underneath a mattress alongside another phone.

{¶25} After searching Ashley's phone, officers were not able to recover any data that shed light on Ashley's death or how she acquired narcotics. However, Ashley was declared to have died from an overdose.

Analysis

{¶26} Crowe now contends that the State presented insufficient evidence to convict him of Tampering with Evidence. Importantly, there are three elements to the offense of Tampering with Evidence: "(1) the knowledge of an official proceeding or investigation in progress or likely to be instituted, (2) the alteration, destruction, concealment, or removal of the potential evidence, (3) the purpose of impairing the potential evidence's availability or value in such proceeding or investigation." *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, ¶ 11.

{¶27} In challenging his conviction, Crowe argues that there was no evidence that he had knowledge of an official proceeding or investigation, that there

was no evidence as to how he came to be in possession of the phone, that there was no indication that he intended to conceal the phone or keep it, and that there was no underlying crime regarding Ashley's death, thus her phone could not be evidence of a crime. In addition he argues that he did nothing to impair the phone's evidentiary value. In short, he essentially alleges that the State presented no evidence whatsoever that would meet any of the required elements of Tampering with Evidence.

{¶28} As to Crowe's claim that there was no official proceeding or investigation pending so he could have no knowledge of an investigation, Crowe was aware that the police were looking for the phone. He was also aware that police were looking for drugs and drug paraphernalia in the residence and in the car, in the hopes of explaining Ashley's death. The police also hoped to potentially find who sold Ashley narcotics through her phone and piece together a timeline of her final hours. Further, Crowe was interviewed and gave a written statement to police in the hours after Ashley's death. In combination, these facts constitute sufficient evidence that an investigation was occurring and that Crowe was aware of the ongoing investigation. *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556; *See also State v. Workman*, 3d Dist. Auglaize No. 2-15-05, 2015-Ohio-5049, ¶ 56.

{¶29} Regarding Crowe's possession and concealment of the phone, Crowe gave multiple conflicting statements about the phone's location, first indicating to

the police that he did not know where the phone was, then stating to Pam and Ryan that he had the phone in Ryan's truck at one point, then claiming he left it outside of Pam and Ryan's garage. Subsequently the phone was found in Crowe's bedroom, concealed underneath a mattress as though he was trying to hide it.

{¶30} In addition, over thirty photographs were exchanged between Crowe's phone and Ashley's phone eight days after her death. Given the presence of Ashley's cell phone underneath Crowe's mattress, the pictures exchanged eight days after Ashley's death, and Crowe's conflicting stories about the location of the phone, there was sufficient evidence for a jury to find that Crowe possessed and tried to conceal the phone. *See State v. Workman*, 3d Dist. Auglaize No. 2-15-05, 2015-Ohio-5049, ¶ 56.

{¶31} As to Crowe's contention that there was ultimately no evidentiary value to the phone so he did not impair its value or availability as evidence, we note that a detective testified that phone extractions were not perfect, that sometimes things did not transfer, and that sometimes not all pertinent information was extracted. The detective indicated that the material that could be retrieved from a cell phone in an extraction varied and depended on the make and model of the phone. (Tr. at 258).

{¶32} Notwithstanding this point, by keeping the phone under his mattress and not informing law enforcement or Pam and Ryan that he had it, Crowe was

hampering the *availability* of the phone as evidence or as an investigatory tool. Just because the cell phone did not ultimately result in actionable intelligence or the charging of a crime does not mean that it was not a crime for Crowe to conceal it when the officers could have used it to explore various investigative avenues or even eliminate some. In fact a detective testified that the investigation into Ashley's death was still open as of the date of trial. (Tr. at 232).

{¶33} In sum, when reviewing a sufficiency claim, we must look at the evidence in the light most favorable to the State, and in doing so in this case, there was ample testimony and numerous inferences that could be made based on the evidence presented that would support Crowe's conviction. *See State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 77. Therefore, his second assignment of error is overruled.

*First Assignment of Error*

{¶34} In Crowe's first assignment of error, he argues that even if there was sufficient evidence presented to convict him of Tampering with Evidence, his conviction was against the manifest weight of the evidence.

Standard of Review

{¶35} In reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. In doing

so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*

**{¶36}** Nevertheless, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

Analysis

**{¶37}** In arguing that his conviction for Tampering with Evidence was against the manifest weight of the evidence, Crowe claims that the evidence did not establish that there was a crime regarding Ashley's death so no investigation was impeded. Crowe also argues that there was no indication that he was aware of a pending investigation and constructive knowledge of an investigation could not be imputed to him.

{¶38} Crowe points to some of the evidence presented at trial, claiming it supports an acquittal in this matter. He contends that there is no indication of where Ashley's cell phone was between January 3, 2018, and January 11, 2018, and he notes that the last time Ashley's phone produced GPS coordinates before January 11, 2018, was on January 3, 2018. At that time, approximately 7:30 a.m., the location shown was around Ashley's residence. Crowe contends that if the phone was at Ashley's residence at that time, the evidence showed that he was in Marion with his family and since he did not drive he could not have returned to the house to get the phone. Crowe contends that it is just as likely that he found the phone amongst his things when he was taken back to the residence to get his property on January 10, 2018, and that he simply did not have time to return the phone to police or to Pam and Ryan because Crowe was arrested the next day.

{¶39} Contrary to Crowe's claim that the evidence did not establish that he possessed and concealed the phone, a reasonable interpretation of the evidence was that Crowe either had the phone the whole time and the hours when Crowe left Melmore were slightly different than the testimony, or that Crowe had hidden the phone somewhere and later went to get it, or that the phone died and he never charged it until later, turning it on January 11, 2018, and transferring pictures between his phone and Ashley's phone. Any of these theories would support Crowe possessing the phone. Then, in placing the phone underneath his mattress, a

reasonable jury could infer that Crowe was attempting to conceal it and keep it from a police investigation. *See State v. Workman*, 3d Dist. Auglaize No. 2-15-05, 2015-Ohio-5049, ¶ 56. We must defer to the jury's credibility determinations.[3] *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶40} Next, Crowe states that there is no evidence that he was aware of any official investigation, and that constructive knowledge of an investigation or of a likely investigation was not enough to support a conviction for Tampering with Evidence pursuant to the Supreme Court of Ohio's decision in *State v. Barry*, 145 Ohio St.3d 354, 2015-Ohio-5449.

{¶41} In *Barry*, Barry travelled to Middletown, Ohio where her friends convinced her to conceal a package of heroin in her vagina. She did so. She and the others then drove to Scioto County where they were stopped by police for a defective muffler and erratic driving. The officer who approached the car smelled marijuana and an investigation ensued. Barry eventually admitted she had concealed heroin inside her body. Barry was subsequently charged with and convicted of Tampering with Evidence in addition to other crimes.

{¶42} The Fourth District Court of Appeals affirmed Barry's conviction for Tampering but certified its decision to the Supreme Court of Ohio after finding it to

---

[3] At trial, Crowe introduced some testimony that there was a phone-tracking application on Ashley's phone called "Life360." Both of Ashley's parents had Life360 on their phones, but they did not have the ability to track Ashley's; rather, apparently only Ashley's ex-boyfriend had access to Ashley's location through Life360.

be in conflict with a Second District case. The Supreme Court of Ohio was asked to determine "whether knowledge that an official proceeding or investigation is pending or likely to be instituted can be imputed to one who commits a crime, regardless of whether that crime is likely to be reported to law enforcement." *Id.* at ¶ 17.

{¶43} The Court found that in order to convict Barry of Tampering with Evidence, the State had to prove that at the time she concealed the heroin, Barry knew that an investigation into her drug trafficking and possession was likely to be instituted. *Id.* at ¶ 22. The Court went on to find:

> **[T]here is no evidence that at the time she concealed the heroin in her body in Middletown, Ohio, Barry knew or could have known that a state trooper would stop her car in Scioto County and begin an investigation of her for drug trafficking and drug possession. Thus, the trial court erred in instructing the jury that by committing an unmistakable crime, Barry had constructive knowledge of an impending investigation of that crime, and her tampering conviction is not supported by sufficient evidence.**

*Id.* at ¶ 3.

{¶44} While *Barry* held that constructive knowledge of an impending investigation based solely on the commission of an offense was not sufficient to show that a defendant had the requisite intent for Tampering with Evidence, the Supreme Court of Ohio subsequently clarified and distinguished *Barry* less than two years after it was released in *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556. In *Martin*, the Court clarified that a jury could reasonably infer that a person

committing a homicide would be on notice that an investigation was likely to begin because homicides "are highly likely to be discovered and investigated. ¶ 118.

**{¶45}** The facts here are more similar to *Martin* than *Barry*, though both are distinguishable. Here there was a death of a twenty-six year old otherwise healthy woman. It would be reasonable to infer that an investigation was likely to be undertaken into her death, regardless of whether a crime was ultimately charged in causing her death.

**{¶46}** Notwithstanding this point, we need not delve deeply into a discussion of "constructive knowledge" of an investigation in this matter because the jury could readily determine that Crowe had *actual* knowledge of an investigation. Crowe was present and relatively involved in the search of Ashley's residence and her vehicle. After Ashley was pronounced dead Crowe was interviewed by the police and he gave a written statement. It would be reasonable under the circumstances to conclude that Crowe had actual knowledge of an investigation into Ashley's cause of death. *See State v. Workman*, 3d Dist. Auglaize No. 2-15-05, 2015-Ohio-5049, ¶ 56. Thus Crowe's argument related to knowledge of an investigation is not well-taken.

**{¶47}** Finally, Crowe argues that since no evidence of a crime was found on Ashley's cell phone, he could not be convicted. However, the statutory elements do not require that the concealed item actually be used as evidence. Nevertheless, an

officer gave testimony that transfers are not always perfect and sometimes they are unable to detect deleted material. Moreover, the phone could have been a valuable investigative tool to search various avenues of how Ashley obtained drugs and how she spent her final hours. Thus this argument is not well-taken.

{¶48} In sum, when deferring to the credibility determinations of the factfinder as we are directed, we cannot find that the jury clearly lost its way and created a manifest miscarriage of justice here. Therefore, Crowe's first assignment of error is overruled.

### Conclusion

{¶49} For the foregoing reasons, Crowe's assignments of error are overruled and the judgment of the Seneca County Common Pleas Court is affirmed.

**Judgment Affirmed**

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**