[Cite as *State v. Queen*, 2021-Ohio-1131.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HARDIN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,              CASE NO. 6-20-13

    v.

ANTHONY MICHAEL QUEEN,

                                  O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Hardin County Common Pleas Court
Trial Court No. CRI 20202019

**Judgment Affirmed**

Date of Decision: April 5, 2021

APPEARANCES:

    *Emily P. Beckley* for Appellant

    *Jason M. Miller* for Appellee

**SHAW, J.**

{¶1} Defendant-appellant, Anthony Michael Queen ("Queen"), brings this appeal from the August 20, 2020 judgment of the Hardin County Common Pleas Court sentencing him to an aggregate prison term of thirteen years and three months after Queen was convicted in a jury trial of burglary with a firearm specification, breaking and entering, having weapons while under disability, and tampering with evidence. On appeal, Queen argues that there was insufficient evidence presented to convict him, and that his burglary and breaking and entering convictions should have merged for purposes of sentencing.

*Background*

{¶2} On February 12, 2020, Queen was indicted for burglary in violation of R.C. 2911.12(A)(2), a felony of the second degree, with a firearm specification pursuant to R.C. 2941.141(A) (Count 1), safecracking in violation of R.C. 2911.31(A), a felony of the fourth degree (Count 2), grand theft in violation of R.C. 2913.02(A)(1), a felony of the fourth degree (Count 3), ten counts of grand theft in violation of R.C. 2913.02(A)(1) (Counts 4-13), all felonies of the third degree due to the items allegedly being stolen being firearms, breaking and entering in violation of R.C. 2911.13(A), a felony of the fifth degree (Count 14), having weapons while under disability in violation of R.C. 2923.13(A)(2), a felony of the third degree (Count 15), and two counts of tampering with evidence in violation of R.C.

2921.12(A)(1), both felonies of the third degree (Counts 16 and 17). It was alleged that on November 27, 2018, Queen and another individual went to the residence of Robert W. while Robert was out and broke into Robert's barn. Queen then stole an air compressor, a chainsaw, tires and rims, and a zero-turn lawnmower from the barn. In addition, Queen and the other individual allegedly entered Robert's residence and removed a gun safe that contained, *inter alia*, ten firearms. At the time of the incident, Queen was under a weapons disability due to multiple prior burglary convictions, thus he was also charged with having weapons while under disability. Finally, the two tampering with evidence charges were related to Queen allegedly disposing of the gun safe in a pond and Queen allegedly destroying his cell phone to hinder the law enforcement investigation.

{¶3} Queen proceeded to a jury trial, which was held July 8-10, 2020. At the conclusion of the State's case-in-chief, the State dismissed the tampering with evidence charge in Count 16 related to the gun safe. The State also amended the grand theft charge in Count 3 related to the total value of property taken from the barn to a fifth degree felony due to the evidence presented regarding values of the stolen items. Ultimately the jury found Queen guilty of burglary with the firearm specification, guilty of grand theft related to the property taken from the barn, guilty of five counts of grand theft related to Queen stealing firearms, guilty of breaking

and entering, and guilty of tampering with evidence. Queen was acquitted of safecracking and he was also acquitted of five counts of grand theft of firearms.

{¶4} When the matter proceeded to sentencing, the parties provided arguments related to potential merger of various offenses. The trial court determined that the grand theft counts related to firearms taken from the gun safe in the residence all merged with the burglary charge. The State elected to proceed to sentencing on the burglary with the firearm specification. The trial court also found that the grand theft of property from the barn merged with the breaking and entering of the barn. The State elected to proceed to sentencing on the breaking and entering. The weapons under disability charge and the tampering with evidence charged were not merged with any charges.

{¶5} The trial court then ordered Queen to serve seven years in prison on the burglary charge, with a consecutive one-year mandatory prison term for the attached firearm specification. Queen was ordered to serve nine months in prison on the breaking and entering charge, thirty months in prison on the weapons under disability charge, and twenty-four months in prison on the tampering with evidence charge. All of the prison terms were ordered to be served consecutive to each other for an aggregate term of thirteen years and three months. A judgment entry memorializing Queen's sentence was filed August 20, 2020. It is from this

judgment that Queen appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**Appellant's conviction was not supported by sufficient evidence.**

**Assignment of Error No. 2**
**The trial court erred in sentencing appellant for allied offenses of similar import.**

*First Assignment of Error*

{¶6} In his first assignment of error, Queen argues that there was insufficient evidence presented to convict him of the various charges. However, although Queen styles his first assignment of error as contesting only sufficiency of the evidence in this case, the final line of his argument in his brief asserts that his convictions were also against the manifest weight of the evidence. While these are distinctly different topics with different standards of review, we will address both in the interests of justice.

Standard of Review

{¶7} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *State v. Pountney*, 152 Ohio St.3d 474, 2018-Ohio-22, ¶ 19 (an appellate court's function in a sufficiency review is not

to determine if the evidence *should* be believed). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Ford*, --- Ohio St.3d ---, 2019-Ohio-4539, ¶ 317. "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.); *see also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997) ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence.").

{¶8} By contrast, in reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way

and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*

**{¶9}** Nevertheless, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

### Controlling Authority

**{¶10}** In this case Queen was convicted of burglary in violation of R.C. 2911.12(A)(2), which reads

> **(A)  No person, by force, stealth, or deception, shall do any of the following:**
>
> **\* \* \***
>
> **(2)  Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense[.]**[1]

---

[1] The burglary carried an attached firearm specification pursuant to R.C. 2941.141, which states, in pertinent part, that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense."

{¶11} Queen was also convicted of breaking and entering in violation of R.C. 2911.13(A), which reads, "No person by force, stealth, or deception, shall trespass in an unoccupied structure, with purpose to commit therein any theft offense, as defined in section 2913.01 of the Revised Code, or any felony."

{¶12} In addition, Queen was convicted of having weapons while under disability in violation of R.C. 2923.13(A)(2), which reads,

**(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:**

**\* \* \***

**(2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.**

{¶13} Finally, Queen was convicted of tampering with evidence in violation of R.C. 2921.12(A)(1), which reads,

**(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:**

**(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]**

Evidence Presented at Trial

{¶14} The victim in this matter, Robert, lived with his girlfriend, Jessica D., and her children for over six months in Robert's Hardin County residence prior to November 20, 2018. Robert's property contained a sizable barn, large enough to hold three combines.

{¶15} In the weeks prior to November 20, 2018, Jessica testified that her relationship with Robert was deteriorating. She decided to move out and end the relationship. For the move, she enlisted help from family and friends to get her items out of Robert's residence while Robert was at work. Jessica asked her sister and her mother for help with the move, along with a man named Terry.[2] In addition, Jessica asked a friend named McKenzie for help. At the time, McKenzie was dating a man named Adam, who was Queen's brother. Testimony indicated that Jessica was related to Adam and Queen by marriage.

{¶16} When Jessica went to pick up McKenzie where McKenzie was staying, Adam and Queen came out of the residence and stated that they would help with the move. Jessica claimed that she did not want Adam's or Queen's help, but they brought a dark-colored Ford F-150 truck and came anyway. The group spent the day at Robert's property while he was gone loading up Jessica's things into multiple vehicles.

---

[2] Terry would later become Jessica's fiancé.

{¶17} At one point, Jessica had to go into the barn and Queen followed her inside after Jessica unlocked the combination padlock. Queen and Adam were also inside Robert's residence despite Jessica's reservations as to them being present at all, let alone inside the residence. However, Jessica testified that she specifically told Queen and Adam what to take from the residence, and that she told them not to touch or take any of Robert's things.

{¶18} By the evening of November 20, 2018, the move was completed. The individuals involved with the move left, taking Jessica's property. Robert returned to the residence and learned that Jessica had moved out. There is no indication that at this time that any of Robert's things were missing; rather, Jessica had only taken her property.

{¶19} A week later, on November 27, 2018, Robert returned home in the evening and saw that his log splitter was outside of his barn, which he testified was unusual. He then went to his barn and saw that the combination padlock was gone completely. Upon entering the barn, he determined that he was missing a blue zero-turn lawnmower, an air compressor, a chainsaw, and a set of rims and tires he had recently purchased.

{¶20} Robert then went to his house and noticed that the door had been visibly broken into. When he went inside he discovered that his gun safe, which had been bolted to the floor, was missing. Robert called the police and officers

responded to his residence. Robert detailed the contents of his gun safe, which included approximately ten firearms in addition to multiple "bb" guns.

{¶21} While officers were at the scene, they observed the missing lock on the barn, signs of forced entry to the residence, and drag marks inside the residence where the gun safe had been pulled from the location it was bolted into the floor. Robert called Jessica and asked who had been involved with her move, though he told police that he did not think Jessica would have taken his things after she moved out. Jessica relayed the information regarding who helped her move and she later gave officers permission to search her phone.

{¶22} In the hours prior to Robert returning home on November 27, 2018, a group of hunters were returning for the day to a residence up the road from Robert's property. One of the hunters, Erick R., was in the passenger seat of a vehicle and he noticed that a couple of people with a truck and a trailer were loading up some items on Robert's property, including a lawnmower. Erick testified that at the time he "thought nothing of it." (Tr. at 172).

{¶23} Erick testified that a short time later, as he was leaving his friend's residence, he was preparing to turn onto the road from his friend's driveway when he saw the pickup truck that had been at Robert's residence again. He testified as follows.

> **There's a pickup. It was a Ford, and there was two guys that had glasses and tattoos on. There's a lawnmower hanging off the**

> **back, the tailgate of the trailer was dragging the road, and the wheels of the lawnmower were on the road. It was a zero turn. They were on the road just wobbling all over. And they were headed west.**

(Tr. at 175). Erick further testified that "[s]parks were flying" due to the tailgate dragging on the pavement. (*Id*. at 176).

{¶24} Erick specified that the truck was a dark-colored Ford F-150 with a chrome grill around the front.[3] He also noticed an air compressor "on the front of it." (Tr. at 178). Erick called his friend and told his friend about what he saw, and this information eventually got relayed to Robert, and finally law enforcement on the evening of the burglary. Law enforcement officers were able to locate tracks where the tailgate from the truck was dragging in the road but they eventually could not follow the tracks further due to Amish buggy markings on the pavement.

{¶25} Linda Queen, fka Hoskins, Queen's wife at the time of trial, received a text message from Queen on the night in question with a picture of a blue zero-turn mower. Linda denied remembering that Queen had sent her a picture message of the mower; however, the photograph was discovered through forensic analysis of her phone.

{¶26} Later in the evening of November 27, 2018, Linda recalled Queen returning home with his brother Adam in the Ford F-150 truck. The truck was

---

[3] In his statement to police Erick further clarified that it was "an early 2000 model F-150 single cab, two-wheel drive dark-colored truck I believe that had running boards with trailer was like six by seven[.]" (Tr. at 181).

-12-

registered to Linda's mother, but Linda paid for it and she allowed Queen to drive it whenever he wanted. It was dark outside when Queen and Adam arrived at the residence and they had the blue riding lawnmower with them, as well as an air compressor, and a chainsaw. Queen told Linda that he obtained the lawnmower from Jessica.

{¶27} Officers determined that Queen was a person of interest related to the burglary at Robert's residence after learning Queen was involved with helping Jessica move out of Robert's residence the week prior and after learning that he was driving a dark-colored Ford F-150 pickup, which matched the description that Erick observed leaving Robert's residence on the night in question.

{¶28} Officers located an address for Queen in Bellefontaine, Ohio, then drove past and saw a black Ford truck with a trailer matching the description that Erick had provided. Officers were also able to observe a "black roll bar sticking out of a blue tarp behind the house matching the color of the roll bar from the Dixon mower that had been stolen" from Robert. (State's Ex. 56). Agents from the Adult Parole Authority who were monitoring Queen also went to Queen's residence and located a red, stand-up air compressor and the Dixon zero-turn mower. Subsequently a search warrant was obtained for the residence where Queen was staying.

{¶29} On December 4, 2018, officers served the search warrant and searched the residence where Queen was staying with Linda. Officers located numerous pieces of property belonging to Robert, including the aforementioned mower and the air compressor. A firearm was also located near the bed where Queen and Linda slept. Queen was not home at the time the residence was searched; however, he was observed driving past the residence as the search was underway. Linda sent Queen text messages to "run" approximately four times. (Tr. at 468).

{¶30} Queen was located several days later in Kenton, staying in the residence of a friend. Officers were permitted into the residence and when they went upstairs to apprehend Queen, he had broken his cell phone. According to Queen's friend, Queen had just been using the cell phone minutes before.

{¶31} Officers found the black F-150 parked outside the residence of Queen's friend, where Queen was staying. The truck had the tires and rims taken from Robert's residence in the back. In the truck cab there was a handwritten list of guns, which matched the guns that had been taken from Robert's safe.

{¶32} Once he was apprehended, Queen gave a videotaped interview with police. In the interview he acknowledged taking items from Robert's barn; however, he claimed that he had permission from Jessica to take those things because they were Jessica's property. He stated that he had helped Jessica move out of Robert's residence and that they had made two or three trips out to the

residence on different days, contrary to Jessica's testimony and the other witnesses who assisted with the move. Nevertheless, Queen claimed that Jessica actually opened the padlock to the barn for him so he could get inside and get her things. However, Queen stated that he never went inside Robert's home.

{¶33} As to why he did not stop when officers were searching his residence with the search warrant on December 4, 2018, Queen claimed that he did not have a license and knew that he was in violation of his parole by driving without a license so he was scared. Finally, Queen claimed that Jessica had probably concocted the story that he had committed a burglary because she often stole things from her exes.

{¶34} Through the investigation, officers were able to discover that Queen was corresponding via text with a man named Joshua. On December 4, 2018, Queen messaged Joshua and stated that he had a "60-inch zero turn and about five rifles to get rid of. A hundred apiece. And I'll take the mower – 800 for the mower. It only has 600 hours." (Tr. at 554); (State's Ex. 200). No transactions ever occurred between Queen and Joshua.

{¶35} Meanwhile, officers located the gun safe by using cell tower analysis related to Adam Queen's phone. The safe had been broken into and left in a pond. Further, officers obtained information that Adam Queen had traded several firearms for an el camino. Adam initially was offering to trade a zero-turn mower for the el camino, but claimed his brother had kept the mower, so he offered firearms instead.

Most of the firearms exchanged in the transaction were recovered and found to be those that were taken from Robert's gun safe. Some were test-fired and found to be operable.

{¶36} Police investigated the other individuals involved with Jessica's move from Robert's residence, including Jessica herself. In doing so, the State obtained voluminous phone records from numerous witnesses. Officers also used tracking data from the cell phones to narrow the list of suspects. After looking into the potential suspects, they determined that the others involved with the November 20, 2018 move had alibis or were not involved in the November 27, 2018, theft along with Queen (with the possible exception of Adam).

{¶37} Finally, stipulations were entered into the record regarding Queen's prior convictions. He had been previously convicted of three counts of burglary in Logan County, all felonies of the third degree, and two counts of burglary in Richland County, one being a felony of the third degree, and one being a felony of the second degree.

{¶38} Ultimately the State introduced well over one hundred exhibits into evidence, including various photographs of the scene at Robert's residence, photographs of the F-150, and photographs of the property located where Queen was staying. In addition, cell phone records and conversations were introduced into evidence, alongside exhibits related to search warrants and test-firing multiple

weapons. Although Queen's attorney cross-examined the State's witnesses, he did not present any evidence.

{¶39} Queen was convicted and sentenced for burglary of the residence, breaking and entering of the barn, having weapons while under disability for handling firearms under disability, and tampering with evidence for destroying his cell phone as officers were approaching him.

Analysis

{¶40} On appeal, Queen argues that the State could not even prove that he was on Robert's property on the date in question, let alone that he had entered into the buildings or had actually taken any of Robert's property. He also contends that the evidence established that the firearms from the safe were in his brother Adam's possession, not his, and that it was Adam's phone that was used to locate the gun safe in the pond. Further, he contends that there was some testimony that his phone had been run over by a vehicle, not broken just before he was apprehended by the police. Altogether, Queen argues that his convictions were not supported by sufficient evidence and/or were against the manifest weight of the evidence.

{¶41} With regard to the burglary charge, there was evidence presented of forced entry into Robert's residence and evidence presented that established a gun safe had been removed. The gun safe contained as many as ten firearms, which Robert detailed. A handwritten list of firearms corresponding to those in Robert's

gun safe was contained on the back of a receipt in the black F-150 truck Queen was driving. Text messages were exchanged between Queen and a man named Joshua wherein Queen was offering to sell a zero-turn mower and numerous firearms. Further, the truck that Queen was driving was observed by a disinterested witness at Robert's residence and later leaving Robert's residence with the mower on the back of a trailer. Additionally, Queen had been to Robert's residence only a week prior to help Jessica move. Witnesses saw him inside the residence and the barn at that time and he could have seen what items remained on Robert's property.

{¶42} Moreover, Queen also destroyed his cell phone as police were approaching him. This could indicate consciousness of guilt, which the jury was instructed on. *See State v. Crosby*, 8th Dist. Cuyahoga No. 106504, 2018-Ohio-3793, ¶ 14. Furthermore, Queen's then-girlfriend Linda received a picture on the night in question of the zero-turn mower, and she saw Queen return with various items of personal property.

{¶43} Given the record as a whole, there was a significant amount of circumstantial evidence linking Queen to the burglary in this matter. While Queen argues that there was no direct evidence establishing that he entered the residence to take the gun safe, the law does not consider circumstantial evidence to be less probative than direct evidence. *State v. Jefferson*, 3d Dist. Allen No. 1-20-01, 2021-Ohio-281, ¶ 6, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of

the syllabus ("Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof."). Accordingly, we cannot find that there was insufficient evidence presented to convict Queen of burglary, or that the conviction was against the manifest weight of the evidence when taking into account the jury's ability to make credibility determinations.

{¶44} As to the breaking and entering conviction related to the barn, Robert testified that there was a combination padlock on the barn that had been removed and numerous items had been taken from inside. Queen actually admitted in his police interview that he had taken items from the barn; however, he claimed he had permission. Robert and Jessica both denied that Queen ever had permission to take any items from the barn that were Robert's. Furthermore, the mower, air compressor, and chainsaw were found at the residence where Queen was staying, and the rims and tires from the barn were found in the back of the truck Queen was driving. Jessica testified at trial that Robert purchased those rims and tires and that she did not even have a vehicle that could use those rims and tires, further establishing that she never could have given proper permission for Queen to take them even if his story was to be believed. Based on all of the evidence presented, we cannot find that there was insufficient evidence to convict Queen of breaking and entering, or that the conviction was against the manifest weight of the evidence.

{¶45} As to the weapons under disability charge, it was stipulated that Queen had prior convictions that would place him under a firearm disability. There was evidence presented that Queen had access to a firearm at the residence where he was staying, and there was circumstantial evidence presented that he took firearms from Robert's home and that he tried to sell them. For all of these reasons, we cannot find that there was insufficient evidence presented to support his conviction for having weapons while under disability, or that the conviction was against the manifest weight of the evidence.

{¶46} Finally, as to the tampering with evidence charge, there was testimony and evidence presented that Queen broke his cell phone to impair its value for investigative purposes just as officers were closing in on him. Cases have held that the destruction of a cell phone can support a conviction for tampering with evidence, and we can find no different here as it was a determination for the jury in this matter. *State v. Crowe*, 3d Dist. Seneca No. 13-19-41, 2020-Ohio-1314, ¶ 30; *State v. Workman*, 3d Dist. Auglaize No. 2-15-05, 2015-Ohio-5049, ¶ 56.

{¶47} In sum, there was sufficient evidence presented to support all of Queen's convictions.[4] In addition, there was a significant amount of circumstantial

---

[4] Given that numerous grand theft charges were merged with the burglary for purposes of sentencing and one grand theft charge was merged with the breaking and entering for purposes of sentencing, we need not discuss the sufficiency or weight of these issues because no conviction has been entered. *State v. Kunzer*, 3d Dist. Crawford No. 3-18-16, 2019-Ohio-2959, ¶ 38. However, even if we did have to analyze these issues, the circumstantial evidence also supports the jury's verdicts.

evidence establishing Queen's guilt on all four of his convictions, thus we cannot find that the jury clearly lost its way or committed a manifest miscarriage of justice by convicting Queen in this matter, particularly when giving deference to a jury's credibility determinations. Therefore, Queen's convictions were also not against the weight of the evidence. For all of these reasons, Queen's first assignment of error is overruled.

*Second Assignment of Error*

{¶48} In his second assignment of error, Queen argues that his convictions for burglary and breaking and entering should have merged for purposes of sentencing.

Standard of Review

{¶49} " 'Whether offenses are allied offenses of similar import is a question of law that this Court reviews de novo.' " *State v. Jessen*, 3d Dist. Auglaize No. 2-18-16, 2019-Ohio-907, ¶ 22, quoting *State v. Frye*, 3d Dist. Allen No. 1-17-30, 2018-Ohio-894; *see generally State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-955.

Relevant Authority

{¶50} Revised Code 2941.25, Ohio's multiple-count statute, states:

**(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**

**(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.**

**{¶51}** In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, the Supreme Court of Ohio held the following with regard to determining allied offenses:

**1.     In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import.**

**2.     Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.**

**3.     Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.**

The Supreme Court in *Ruff* explained:

**At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct. The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import. When a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. Also, a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense. We therefore hold that two or more offenses of**

**dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.**

*Ruff*, 2015-Ohio-995 at ¶ 26.

Analysis

**{¶52}** Queen claims on appeal that his burglary and breaking and entering convictions should have merged for purposes of sentencing. He essentially argues that the victim is the same in this case and that his actions occurred close in time and proximity. However, Queen ignores the fact that the harm from the burglary and the harm from the breaking and entering are separate and readily identifiable.

**{¶53}** The breaking and entering of the barn was complete once Queen entered the barn with an intent to steal items—which he ultimately did. Then, Queen committed an entirely separate crime by going into Robert's residence, forcing open the door and taking the gun safe. These two incidents are completely separate. Queen's commission of one crime did not constitute the commission of the other.

**{¶54}** Under *Ruff*, offenses are not allied where the harm from each offense is separate and identifiable. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 26. The harm/theft done in the barn and the harm/theft done in the house are entirely separate, albeit similar, and could have been completed without the other. Thus, like the trial court, we find that the burglary and breaking and entering convictions

-23-

were not allied offenses of similar import in this case.[5]  Therefore, Queen's second assignment of error is overruled.

*Conclusion*

{¶55} For the foregoing reasons Queen's assignments of error are overruled and the judgment of the Hardin County Common Pleas Court is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and ZIMMERMAN, J., concur.**

**/jlr**

---

[5] Queen does not make any argument in his brief regarding his remaining convictions being allied offenses of similar import.  However, even if he did, we similarly find, like the trial court, that the offenses were committed separately and would not merge for purposes of sentencing.